**CALIFORNIA CITIZENS BAND ASSO-
CIATION, Incorporated, a corpora-
tion, Petitioner,**

v.

**UNITED STATES of America and Fed-
eral Communications Commission,
Respondents.**

No. 20030.

United States Court of Appeals
Ninth Circuit.

March 7, 1967.

Rehearing Denied April 21, 1967.

Donald M. Sea, Sea & Hanna, Oakland, Cal., for petitioner.

Donald F. Turner, Asst. Atty. Gen., Howard E. Shapiro, Lionel Kestenbaum, Attys., Department of Justice, Washington, D. C., Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, William L. Fishman, Counsel, Federal Communications Commission, Washington, D. C., for respondents.

Before MADDEN, Judge of the Court of Claims, and HAMLEY and ELY, Circuit Judges.

HAMLEY, Circuit Judge.

This is a proceeding to review two orders of the Federal Communications Commission (Commission) affecting Class D radio stations in the Citizens Radio Service. Petitioner, California Citizens Band Association, Incorporated, is a non-profit California corporation. All of its members are Citizens Band Radio Clubs. The membership of each such club consists of radio station licensees, duly licensed by the Commission to hold station licenses in the Class D Citizens Radio Service.

In one of the orders under review, released July 29, 1964 (29 FR 11099), the Commission adopted certain amendments to Part 19 (now Part 95) of the Commission's rules. In the other order, released on March 1, 1965 (30 FR 2706), the Commission, on reconsideration, adhered to its earlier determination. Both orders deal with the promulgation of rules affecting the Citizens Radio Service. The rules in question pertain, for the most part, to the kind of messages that may be transmitted, the frequencies that may be used, and the length of silent intervals between transmissions.

The Citizens Radio Service originated in 1945 when the Commission, after extensive inquiries and hearings, allocated a portion of the radio spectrum for a new "Citizens Radio-communication Service." This new service was primarily designed for both personal and business use by private citizens, particularly where other means of communication were not available. It was intended for essential, local communications such as those entailed in the operation of department stores, farms and construction projects. The first rules governing this Service were promulgated in 1947. In these rules, limitations on usage were kept at a minimum in order to foster development of the service.

When these rules were codified in 1949, certain prohibitions were set forth on the types of communications allowed in the Citizens Radio Service. Among other things, the codified rules provided that such stations be used only to communicate with other stations in the Citizens Radio Service; that all communications be limited to the minimum practicable transmission time; and that no station be used to carry communications for hire or in connection with radio broadcasting. In 1958, the Commission revised the rules and, among other things, established within the Citizens Radio Service, a new Class D, which was authorized to operate on certain frequencies in the 27 megacycle band.[1]

---

1. In the Commission rules, the term Class D Citizens Radio Station was defined as follows:

 "A mobile station in the Citizens Radio Service operating on an authorized fre-

quency in the 26.96–27.23 MC frequency band with an authorized plate input power of 5 watts, or less, for radiotelephony only. (Class D stations are authorized to operate as mobile sta-

The Class D category of stations was created to fulfill an increasing need for short-distance voice communication by radio for personal or business use.[2] An ever-increasing number of applicants applied for Class D licenses.[3] Within a year, approximately 15,000 Class D station licenses had been granted.

On July 22, 1959, the Commission began a proceeding to amend its rules dealing with permissible communications in the Citizens Radio Service.[4] The Commission proposed several rule changes which, among other things, would limit the operation of the Class D stations (24 FR 6059–6060) Comments were invited on these proposed rule changes.

These proposed rules, adopted in a policy statement issued February 17, 1960 (25 FR 1408), reflected the Commission's intention that Citizens' radio communication be used primarily for intercommunication between units of a single station (intra-station), rather than for communication with other stations (inter-station). They also gave ef-

fect to the Commission's desire that the Citizens Radio Service be restricted to useful and substantial messages related to the business or personal activities of the individuals concerned.

Communications to random or unknown stations were prohibited. For the first time a duration on the length of communications was prescribed. The exchange of communications between two or more Class D stations (inter-station) was limited to not more than five consecutive minutes, followed by a two-minute silent period. This limitation did not apply to intra-station communications or to emergency communications. These rule amendments were made effective March 15, 1960. See 25 FR 1408–1411.

In November, 1962, the Commission initiated the proposed rule making which eventuated in the entry of the Commission orders here under review. See 27 FR 11500. Proposed amendments to Part 19 (now Part 95) were publicized and interested persons were invited to

tions only; however, they may be operated at fixed locations in accordance with other provisions of this part.)" 23 FR 6132 (In somewhat modified form this definition is now contained in 47 CFR § 95.3 [b].)

In 1959, the Commission also allocated 27.255 MC to be used by Class D stations on a shared basis with stations in other services (24 FR 1791). With this additional allocation, Class D stations were able to operate on twenty-three channels in the band.

2. There are three other categories of stations in the Citizens Radio Service, denominated Classes A, B and C (47 CFR § 95.3 [b]). Each of these categories of stations has different kinds of authorized operations on different frequencies (47 CFR § 95.6). Class D stations, the only category of stations here in question, presently constitute more than ninety percent of the total number of Citizens Radio Service stations. Licenses for Class D, as well as all other classes of stations in the Citizens Radio Service, were to be issued for a term of five years.

3. The Commission attributes this growth to the sporadic long distance transmission characteristics of the 27 MC band, which enables a licensee, for hobbying

purposes, to make contacts with other stations at great distances from his home base. Also, equipment for operation of a Class D station in this range of frequencies is cheaper and simpler than equipment for the other classes of citizens stations. Moreover, eligibility standards for Class D stations are low. An applicant is required only to be a United States citizen, eighteen years of age or older. No examination is required, nor does the applicant need any technical knowledge. See 47 CFR §§ 95.7; 95.13.

4. In this notice of proposed rule making, reported in 24 FR 6059, the Commission stated that a considerable number of individuals may have been planning the operation of facilities in this service for the sole purpose of making random contacts with distant or unknown stations or for engaging in lengthy general discussions in more or less the manner which is customary in the Amateur Radio Service. The Commission expressed the view that such amateur-type operation, if engaged in to any extent, could result in intolerable interference with the operation of radio facilities in this service for short distance communications by radio directed to specific persons or stations on personal or business matters.

file comments on or before January 15, 1963.[5] In the accompanying notice the Commission stated that there were then approximately 350,000 Class D stations and that misuse of the Class D operating privileges had become so prevalent as to threaten the continued usefulness of the service. The Commission also stated in this notice that the proposed rule amendments were designed to make more apparent the permissible and prohibited communications and uses of citizens radio stations.

In response to this notice over 2,500 comments, representing many divergent views, were received and considered by the Commission. No public hearings were held. On July 29, 1964, the Commission released its report and order adopting the new rules.[6] (29 FR 11099) A number of parties, including petitioner, requested reconsideration. In a memorandum opinion and order released on March 1, 1965, the Commission discussed and rejected requests for reconsideration of the order released on July 29, 1964. The Commission provided in this order that the amended rules would become effective on April 26, 1965.[7]

On April 19, 1965, Lafayette Radio Electronics Corporation petitioned the United States Court of Appeals for the Second Circuit to review the Commission's above-described orders of July 29, 1964 and March 1, 1965. That court denied the petition on April 26, 1965, the same day the new rules became effective. Lafayette Radio Electronics Corporation v. United States, 2 Cir., 345 F.2d 278. On the same day California Citizens Band Association, Incorporated, filed the petition for review now before us.

Petitioner contends that some of the rule changes accomplished by the orders under review are invalid because they were adopted without first giving the notice required by law. The notice required to be given concerning the content of proposed rules is governed by 5 U.S.C. § 553(b) (3) (1966), formerly 5 U.S.C. § 1003(a) (3) (1964). It is there provided that notice of rule making shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."[8]

5. The time for filing comments was later extended to March 4, 1963.

6. The orders under review promulgate numerous rule changes. Petitioner asserts that five of these changes modify existing Class D licenses in the following ways:

 (1) The new rules for the first time reserve all but seven of the twenty-three frequencies available to Class D licensees exclusively for intra-station use. (47 CFR § 95.41 [d] [2])

 (2) The operating time for Class D interstation communication is reduced from five minutes of operation and two minutes of silence, to five minutes of operation and five minutes of silence (47 CFR § 95.91 [b]).

 (3) The new rules for the first time prohibit Class D stations from communicating with other units beyond 150 miles (47 CFR § 95.83 [b]).

 (4) The new rules for the first time make an unincorporated association ineligible, with certain exceptions, to hold a Class D station license (47 CFR § 95.13 [a], [b]).

 (5) Under the new rules, a licensee of a Citizens radio station who is engaged in the business of selling Citizens radio transmitting equipment is now prohibited from permitting a customer to operate under his station license. All communications for the purpose of demonstrating such equipment must now consist only of brief messages addressed to other units of the same station. (47 CFR § 95.83 [c]).

7. As of April, 1965, there were more than 800,000 licensees in the Citizens Radio Service, with applications being filed at the rate of approximately 20,000 a month.

8. Petitioner also cites 5 U.S.C. § 552(a) and (b) (1966), formerly 5 U.S.C. § 1002 (a) (1964), in support of its notice argument. That statute, however, refers not to notice of rule making, but to the publication of information, rules, opinions, orders and public records.

 With regard to the publication issue, petitioner also asserts that some of the rule changes in question were not published in the Federal Register as required by 5 U.S.C. § 552(a) and (b) (1966),

Petitioner refers to three rule changes as having been made without compliance with the statutory notice requirement. The first of these is a change in 47 CFR § 95.1, "Basis and Purpose," formerly 47 CFR § 19.1. The only substantial change made in this rule is the inclusion of additional language in one sentence of the rule as presently worded, shown in italics in the margin.[9]

Petitioner does not indicate how it is aggrieved by the inclusion of this additional language in 47 CFR § 95.1. The added words " * * * all to the extent that these uses are not specifically prohibited in this part * * *," merely state explicitly what was in any event necessarily implied in the former rules, and is implied in the new rules even absent this statement. Petitioner could not have believed that either the former rules or the new rules were designed to provide for service "specifically prohibited" in those rules. Thus the negating of any such design injects no new limitation.

The new clause " * * * service for the business or personal activities of licensees, * * * " makes reference to a limitation provision which was already in the rules, but which is now spelled out in greater detail in the "Basis and Purpose" clause of the amended rules.[10] The proposed rules which accompanied the notice of rule making did not show such a contemplated change in the introductory statement of "Basis and Purpose." However, other provisions of the proposed rules contemplated limitations on the use of Class D stations of the same general character (see proposed § 19.61, 27 FR 11503), and considerably more restrictive than those which were finally promulgated. See 47 CFR § 95.83 (1966).

■ Title 5 U.S.C. § 553(b) (3), formerly 5 U.S.C. § 1003(a) (3), does not require an agency to publish in advance every precise proposal which it may ultimately adopt as a rule. Willapoint Oysters, Inc. v. Ewing, 9 Cir., 174 F.2d 676, 684–685; Logansport Broadcasting Corp. v. United States, 93 U.S.App.D.C. 342, 210 F.2d 24, 28. Petitioner argues that cases such as *Willapoint* are not here applicable because, unlike the rules there in question, the rules here under consideration carry criminal penalties. Proposed rules with criminal penalties, petitioner asserts, should be published in advance to afford certainty.

In support of this view, petitioner cites Hotch v. United States, 9 Cir., 212 F.2d 280, 282, 14 Alaska 594. However, in *Hotch*, neither notice that a regulation was to be issued, nor the proposed regulation itself, was published in the Federal Register at the time defendant performed the prohibited act. 208 F.2d at

formerly 5 U.S.C. § 1002(a) (1964), and are invalid for that reason. Petitioner is mistaken as to the lack of publication. As recited in the Editorial Note to Part 95—Citizens Radio Service, 47 CFR Part 95, the rule amendments were published in 29 FR 11099 et seq. on July 31, 1964.

9. "These rules are designed to provide for private short-distance radio communications *service for the business or personal activities of licensees*, for radio signalling, for the control of remote objects or devices by means of radio; *all to the extent that these uses are not specifically prohibited in this part*."

10. Former paragraph (c) of 47 CFR § 19.61 (1963 Supp.) provided, with exceptions not here material, that no station in the Citizens Radio Service shall be used for the transmission of any communica-

tions or signals " * * * other than those concerning the business activities or personal affairs of the licensee, * * * ." In the amended rules this limitation is restated in terms of prohibited uses, one such prohibited use being communications as a hobby or diversion, and another being communications which are "superfluous." See 47 CFR § 95.83(a) (1) and (10) (1966). Also, 47 CFR § 19.2(a) formerly provided that the Citizens Radio Service was " * * * intended for personal or business radio communication, * * * ."

The Commission had also previously stated in its policy statement, issued with the uncontested amended rules on February 17, 1960 (25 FR 1408), that it desired the Citizens service to be restricted to useful and substantial messages related to business or personal matters.

250. In the case before us, as noted above, other provisions of the proposed rules, in addition to previous policy statements published in the Federal Register (25 FR 1408), revealed the same general limitations as those adopted in the "Basis and Purpose" section of the newly adopted rules. Further, the new rules here in question were published in the Federal Register, 29 FR 11099 on July 31, 1964, and were subsequently published in 47 CFR § 95.1, et seq., as required by 5 U.S.C. § 552(a) (3) (1966), formerly 5 U.S.C. § 1002(a) (3).

▇▇▇ Under 5 U.S.C. § 553(b) (3), quoted above opposite footnote reference 8, a notice of rule making is sufficient if it provides a description of the subjects and issues involved. The notice here in question amply describes, as one of the subjects and issues involved, the imposition of additional limitations upon the use which may be made of Class D stations. Since this is also the subject matter and issue dealt with in the language added to the introductory statement of "Basis and Purpose," as contained in 47 CFR § 95.1, the notice was sufficient with respect to that rule change.

On similar reasoning we also conclude that petitioner's contention that the notice of rule making was inadequate with regard to a change in the definition of "Citizens Radio Service," as set out in 47 CFR § 95.3(a), is without merit.

▇▇▇ The third rule change which, petitioner argues, is invalidated by the lack of rule making notice, is the inclusion, for the first time, of a definition of "man-made structure." 47 CFR § 95.3 (c).

Under section 19.25(c), 47 CFR § 19.25(c) (1963 Supp.), the antenna of a Class D station could not " * * * exceed 20 feet in height above any man-made structure or natural formation on which it is mounted, except that when mounted on an existing antenna structure of another station the antenna shall not exceed the height of that antenna structure." The revised rule in 47 CFR § 95.37(c) (1966) states the same general rule in a slightly different way, not here contested.

However, the new rules do include for the first time a definition of "man-made structure." The term is defined in the new rules as: "Any construction other than a tower, mast or pole." 47 CFR § 95.3(c).

Petitioner asserts that this change in the new rules will in all probability have a serious effect on those Class D licensees who live in remote areas and consequently require greater antenna height to effectively operate their Class D radio equipment. We fail to see how this new definition, standing alone, could have such an effect on Class D operations.

Petitioner may have in mind some other rule change which utilizes this defined term in a manner which will produce such a detrimental effect on Class D licensees. However, petitioner makes no reference to a new rule of this kind, nor any contention that any such rule is invalid under the notice requirement. Nor does petitioner refer to any place in its petition for rehearing in which it objected to the inclusion of this definition, and our examination of that petition fails to disclose any such objection. In view of these circumstances we are of the opinion that, insofar as petitioner is concerned, this rule change is not of sufficient consequence to require specific notice thereof prior to promulgation of the change.

Petitioner contends that since the new rules operate to modify outstanding Class D licenses in the respects listed in note 6 above, the Commission erred in promulgating such amendments without first conducting public evidentiary hearings.

The license modifications in question became effective on April 26, 1965, and immediately affected all Class D licenses then outstanding. Nevertheless, since such modifications were accomplished in proceedings applicable to the Citizens Radio Service in general, and were manifested by agency statements of general applicability and future effect, designed to implement, interpret and prescribe

Commission policy, they constituted rules and were promulgated pursuant to rule making. See 5 U.S.C. § 551(4), (5) (1966).

 The Administrative Procedure Act (APA), standing alone, does not require that a public evidentiary hearing be held as a part of rule making procedure. See 5 U.S.C. § 553(c) (1966).[11] Nor is there any constitutional requirement, under the Due Process Clause of the Fifth Amendment, or otherwise, for public evidentiary hearings in connection with such rule making. Bowles v. Willingham, 321 U.S. 503, 519, 64 S.Ct. 641, 88 L.Ed. 892; Alaska Steamship Company v. Federal Maritime Commission, 9 Cir., 356 F.2d 59, 61.

However, petitioner contends that two provisions of the Communications Act of 1934 (Act) require a public evidentiary hearing under the circumstances of this case. One of these provisions is section 316(a), added July 16, 1952, 66 Stat. 718, 47 U.S.C. § 316(a) (1964). It is therein provided that any station license may be modified by the Commission under stated circumstances. This section further provides that no such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor,

" * * * and shall have been given reasonable opportunity, in no event less than thirty days, to show cause by public hearing, *if requested,* why such order of modification should not issue: * * * * " (Emphasis added.)

The notice of rule making, released on November 16, 1962, invited interested persons to file comments on or before March 4, 1963. For all practical purposes this provided petitioner with an opportunity to show cause why the rule changes should not be made. Petitioner was aware of this notice and, in January,

1963, petitioner filed a seventeen-page comment with the Commission. In this document petitioner expressed its views concerning the individual proposals for rule changes. It also expressed its view that the rule making proceeding should be vacated, followed by a study of the general problem. In this connection petitioner stated that, in such a study, ample opportunity should be afforded all interested parties to be "heard" concerning the best way to gain the maximum use of the facilities by the most people.

Within a month after the Commission released the order of July 29, 1964, promulgating the new rules, the petitioner filed a petition for reconsideration in which it requested a "hearing de novo." At least two other parties also petitioned the Commission for a hearing subsequent to this initial order of modification. Since the modification order did not become final until the Commission denied these petitions for reconsideration on February 24, 1965, it is apparent that the Commission should have held a public hearing if section 316(a) was otherwise applicable to these circumstances.

The Commission argues, however, that section 316(a) is not applicable to the general rule making procedures here involved. It is uncontested that the Commission followed the procedures for general rule making set forth in the provisions of section 4 of the APA, 5 U.S.C. § 553 (1966). The Commission argues that this kind of proceeding, which does not provide for an adjudicatory hearing, is adequate where the promulgation of standards of general applicability is involved even where there may be a statutory right to an adjudicatory hearing before an individual application may be denied or a license modified.

In United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081, the case which sets forth the

---

11. As indicated by section 553(c), under such circumstances the APA only requires the agency to give interested persons an opportunity to participate in Rule making through submission of written data, views or arguments with or without opportunity for oral presentation. See Superior Oil Company v. Federal Power Commission, 9 Cir., 322 F.2d 601, 608–609. The Commission provided such an opportunity in the case before us.

broad principle upon which the Commission relies, the Supreme Court held that although section 309(b) of the Communications Act required a "full hearing" before denial of an application for a license, this did not withdraw from the Commission the rule making authority necessary for the orderly conduct of its business. 351 U.S. at 202–203, 76 S.Ct. 763.[12] The *Storer* doctrine was reaffirmed as recently as 1963 in Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112, in which the Supreme Court concluded that the "hearing" granted under section 4 of the APA, 5 U.S.C. § 553 (1966), was permissible under the general rule making requirements, even though a specific section of the Natural Gas Act would have allowed an adjudicatory hearing before an application could be rejected. 377 U.S. at 39–41, 84 S.Ct. 1105.

Petitioner seeks to distinguish these cases on the ground that they involved applications for new licenses or for permission to engage in certain activities, as opposed to proposals to curtail existing licenses by taking away certain rights.

The most recent opinion in which this problem was considered is American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624. Although a provision of the Federal Aviation Act required an adjudicatory hearing before an aviation certificate could be modified, the court there held that since the regulation in question was general in nature, the certificate holders were only entitled to the procedural protection afforded by a rule making hearing pursuant to section 4 of the APA. The court there specifically rejected the contention that the *Storer* doctrine is inapplicable to rule making proceedings, in which outstanding licenses are affected.[13]

The court in *American Airlines* further stated that it was not there concerned with a proceeding that in form was couched as rule making, general in scope and prospective in operation, but in substance and effect individual in impact and condemnatory in purpose. Rather, the proceeding was rule making in both form and effect. Similarly, in the case before us, the Commission promulgated rules which are general in nature and intended to affect all licensees in the same class equally.

The Commission also cites Air Line Pilots Ass'n Internat. v. Quesada, 2 Cir., 276 F.2d 892, for the proposition that no adjudicatory hearing is required in the case before us. In *Quesada* the Administrator of the Federal Aviation Authority

---

12. For a recent application of the *Storer* doctrine by this court and a description of the facts in *Storer*, see Superior Oil Company v. Federal Power Commission, 9 Cir., 322 F.2d 601, 610–613.

13. The court said:
"Petitioners argue that the *Storer* doctrine is restricted to regulations affecting future applications for new licenses or certificates, whereas here the CAB regulation affected rights under existing certificates. That such a restrictive reading of the *Storer* doctrine is unwarranted, is shown by such decisions as National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) ; 12 Air Line Pilots Ass'n Intern. v. Quesada, 276 F. 2d 892 (2nd Cir. 1960) ;13 and Capitol Airways, Inc. v. CAB, 110 U.S.App.D.C. 262, 292 F.2d 755 (1961).14 See also Transcontinental Television Corp. v. FCC, 113 U.S.App.D.C. 384, 308 F.2d 339 (1962).

"The present case is different in particular aspects of the facts or statutory provisions from *Storer* and the other *Storer* doctrine cases. However, the *Storer* doctrine is not to be revised or reshaped by reference to fortuitous circumstances. It rests on a fundamental awareness that rule making is a vital part of the administrative process, particularly adapted to and needful for sound evolution of policy in guiding the future development of industries subject to intensive administrative regulation in the public interest, and that, such rule making is not to be shackled, in the absence of clear and specific Congressional requirement, by importation of formalities developed for the adjudicatory process and basically unsuited for policy rule making. [Footnotes omitted.]" 359 F.2d 628–629.

**52**

had modified the rules affecting the outstanding certificates of airline pilots without giving each pilot the adjudicatory hearing to which he was entitled under the terms of a specific regulation. In upholding the general rule making procedure utilized by the Administrator, the court stated:

"Obviously, unless the incidental limitations upon the use of airmen's certificates were subject to modification by general rules,[7] the conduct of the Administrator's business would be subject to intolerable burdens which might well render it impossible for him effectively to discharge his duties. All changes in certificates would be subject to adjudicative hearings, including appeals to the courts, and each pilot whose license was affected —here some 18,000—might demand to be heard individually. [Footnote omitted]." 276 F.2d at 896.

 Similarly in the case before us it is apparent from a reading of the statute that its primary function is to protect the individual licensee from a modification order of the Commission and is concerned with the conduct and other facts peculiar to an individual licensee. We therefore hold that the general rule making procedure followed by the Commission was not violative of section 316(a) of the Act.

The other provision of the Communications Act of 1934, upon which petitioner relies, is section 303(f) of the Act, 48 Stat. 1082, 47 U.S.C. § 303(f) (1964), which authorizes the Commission to make necessary regulations to prevent interference between stations. That section contains the following proviso:

"*Provided, however,* That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with; * * *"

Petitioner argues that the provision of amended rule 47 CFR § 95.91(b), which requires Class D licensees to maintain five minutes of silence between each five minutes of communication with other Class D stations, as compared to two minutes of silence required under the former rules, constitutes a change in the "times of operation of any station * * *," within the meaning of the above-quoted proviso. If this is true, the Commission was without authority to impose such a change effective as to then outstanding Class D licenses, during the terms for which such licenses were granted, without first holding a public hearing.

In order to determine whether this kind of change constitutes a change in "the times of operation of any station," we have considered certain background facts. These facts are set out in the Commission's memorandum opinion which was released on March 1, 1965. The frequencies available to Class D stations may be used on a shared basis only (47 CFR § 95.5 [a]). In practice, communications may be transmitted on a particular channel only when it is not already being used. The rules require licensees to cooperate in the use of frequencies so as to minimize interference (47 CFR § 95.5 [c]). Class D stations may be operated at any time, day or night. No specific time period is assigned to this class of licensees. The new rules do not require a silent period between periods of intra-station communication, this limitation applying only to inter-station communications.

 The Commission ruled, in its memorandum opinion and order on petitions for reconsideration, that the section 303(f) proviso, insofar as it relates to "times of operation," applies only to those cases where the Commission changes the basic license right. An example of such a change in the basic license right, according to the Commission, would be where, by regulation, it sought to decrease, by reference to total hours or times of day, the operation of a broadcast radio station which is presently authorized to operate from sunrise to sun-

set daily. The Commission expressed the view that the extension of inter-station silent periods of Class D stations, from two minutes to five minutes, did not invoke such a change in a basic license right, and was therefore not covered by the section 303(f) proviso.

We agree with the Commission's analysis of this statutory proviso and the question of its applicability here. The rule change in question, enlarging the silent period from two to five minutes in Class D inter-station communications, constitutes a relatively minor adjustment. In so concluding, we take note that the primary purpose of a class D license is for intra-station communication. Minor changes in carrying on inter-station communications could not, therefore, be considered of sufficient consequence to entitle a Class D licensee to a public hearing under section 303(f).

▮ However, this is not to imply that the Commission could make changes at will in Class D licenses without allowing a public hearing. A drastic change in the allowable operation of a Class D license could result in a judicial determination that a basic license right had been abused, entitling the licensee to a public hearing under section 303(f).

This silent period provision, along with other changes accomplished by the new rules, was designed to preserve the usefulness of the Citizens Radio Service as originally conceived. The former rules were amended in February, 1960 to make it clear that Class D stations licensed in the Citizens Radio Service were authorized "primarily to communicate with other units of the same station; * * *" and "secondarily" to intercommunicate with units of other stations in the Citizens Radio Service (25 FR

1411). The increase in the silent period between inter-station communications, while leaving without limitation intra-station communications, served only to implement that pre-existing policy. See former 47 CFR § 19.61 (1963 Supp.). It did not, in the sense intended by section 303(f), change the "times of operation" of such stations.[14]

We hold that, at least as to petitioner, the Commissioner did not err in promulgating the rule amendments without first conducting public evidentiary hearings.

Petitioner argues that the rule revisions are not supported by a preponderance of the evidence before the Commission, and that the Commission erroneously resorted to outside sources of information. In this connection petitioner has moved for an order requiring the Commission to produce the "other evidence" upon which it relied in making its decision to amend the rules.

▮ In support of its position that this court should review the substantiality of the evidence upon which the Commission based its decision, petitioner cites 5 U.S.C. § 706(2) (E) (1966), formerly 5 U.S.C. § 1009(e) (5) (1964). It is therein provided that the reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be " * * * (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title (formerly 5 U.S.C. §§ 1006 and 1007) or otherwise reviewed on the record of an agency hearing provided by statute; * * * "

Sections 556 and 557 do not apply to rule making except in cases where required, by some other statute, to be made on the record after opportunity for an agency hearing. See 5 U.S.C. § 554(c).

---

14. Petitioner similarly contends that new rule 47 CFR § 95.41(d) (2), for the first time reserving all but seven of the twenty-three frequencies available for Class D Citizens Radio Service exclusively for intra-station use, effectuated a change in the "frequencies" of such station, giving effect to the section 303(f) proviso requirement for a public hearing. However, we agree with the view expressed by the Commission in its memorandum opinion and order on petition for reconsideration that the change effectuated by this rule, affecting only inter-station communications, does not amount to a change in the frequencies of Class D licenses, but in use that may be made of sixteen of the assigned frequencies.

As stated above, the rule making here in question was not required by any other statute to be so made.

 Under these circumstances, and pursuant to 5 U.S.C. § 553(c), it was not necessary for the Commission to receive any evidence, as such, in this rule making proceeding. It was necessary only for the Commission to provide opportunity for, and consider, "written data, views, or arguments with or without opportunity for oral presentation," and this it did. See 1 Davis—Administrative Law (Treatise) §§ 6.01–.02. It follows that section 706(2) (E) does not entitle petitioner to request this court to review the substantiality of the evidence.

When, as here, a statute does not require that a particular kind of rule making be on a record made after a public hearing, the Commission is not confined to evidence presented in some formal manner. It may act not only on the basis of the comments received in response to its notice of rule making, but also upon the basis of information available in its own files, and upon the knowledge and expertise of the agency. Pacific Coast European Conference v. United States, 9 Cir., 350 F.2d 197, 205. See, also, American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624, 629.

Accordingly, we deny petitioner's motion that the Commission be ordered to produce in this court the other evidence upon which it relied in making its decision to amend the rules.

Petitioner argues that the Commission acted arbitrarily, capriciously, and contrary to the public interest, in promulgating the amended rules. Petitioner specifies five respects in which, in its view, the Commission acted in this manner.

The first of these is the Commission's promulgation of the amended rules without first holding a public hearing. This general contention has been discussed and rejected above, and does not require further consideration.

The second point which petitioner urges under this heading is that the amended rules discriminate against those Class D licensees who desire to communicate inter-station. In this connection, petitioner asserts that the bulk of the Class D traffic in California and in most other areas is inter-station in character. Petitioner further asserts that five of the seven frequencies which, under the new rules, may be used for inter-station communications, are notoriously unreliable due to interference from other services and from diathermy equipment, and due to placing four of these channels in consecutive frequencies.

The former rules provided that Class D stations were authorized "primarily" to communicate with other units of the same station. Such licensees were authorized to communicate inter-station "only when necessary" for the exchange of substantive messages related to the business or personal activities of the individuals concerned. See former 47 CFR § 19.61 (1963 Supp.). Thus if, as petitioner asserts, the bulk of Class D traffic at the time of the rule changes was inter-station in character, it is evident that there was then wide-spread abuse of then existing agency policy.

 The Commission's memorandum opinion and order on petition for reconsideration recite in detail why, in the opinion of that agency, it was necessary to implement pre-existing policy against general use of Class D stations for inter-station communications, by reducing from twenty-three to seven, the number of frequencies which might be so utilized. This memorandum and order was published on March 3, 1965, in 30 FR 2706, and need not be summarized here. We conclude that the reasons there given are entirely adequate to support the rule changes designed to curtail inter-station use of Class D stations in keeping with pre-existing policy.

 The selection of the seven frequencies which, under the new rules, could be used on a limited basis for inter-station communication, called for consideration of highly technical factors.

We are in no position to rule that the Commission acted arbitrarily and capriciously in making that selection.

Nor do we find any basis for holding that the new rules represent arbitrary and capricious action in the three other respects upon which the petitioner relies.[15] The general regulatory problem involved nearly five million transmitters licensed to over 1.4 million licensees in the Safety and Special Radio Services, the bulk of these being in the Citizens Radio Service. It was absolutely essential that the regulations governing such a vast activity be framed in general terms with a minimum of exceptions, provisos and other avenues for seeking case by case consideration.

If, in practice, a particular rule change proves to be incompatible with the overall scheme of regulation, or unworkable under particular circumstances, individual licensees may seek a corrective rule amendment. These individual problems, however, are not matters appropriate for judicial consideration in proceedings to review the promulgation of general rules.

We hold that the Commission did not act arbitrarily and capriciously, but properly within the bounds of the authority conferred upon it, in classifying radio stations and prescribing the nature of the services to be rendered by each class of licensed stations. See section 303(a) and (b) of the Act, 48 Stat. 1082, 47 U.S. C. § 303(a) and (b) (1964).

Petitioner contends that, in promulgating the new rules, the Commission violated section 326 of the Act, 48 Stat. 1091, 47 U.S.C. § 326 (1964), pertaining to censorship and impaired the First Amendment right of freedom of speech. Petitioner further argues that the new rules are unenforceable for vagueness. For the reasons stated in Lafayette Radio Electronics Corp. v. United States, 2 Cir., 345 F.2d 278, dealing with these same rule changes, we hold that the new rules are not invalid for any of these reasons.

The other arguments advanced by petitioner have also been considered and, in our opinion, are without merit.

Affirmed.

---

15. These three particulars are as follows: (1) the limitations prescribed in the new rules apply nationwide without differentiation as to the varying problems of rural and metropolitan areas, (2) the new rules reduce antenna heights uniformly without taking into account the needs of different areas, and (3) the new rules strike the clause "and other purposes not specifically prohibited in this part," as contained in the former definition of Citizens Radio Service. See former 47 CFR § 19.1(a), and present 47 CFR §§ 95.1, 95.3(a).