The **NATIONAL NUTRITIONAL FOODS
ASSOCIATION** and Solgar Co., Inc.,
Plaintiffs,

v.

Caspar W. **WEINBERGER,** Secretary of
Health, Education and Welfare, and
Alexander M. Schmidt, Commissioner
of Food and Drugs, Defendants.

No. 73 Civ. 3448.

United States District Court,
S. D. New York.

April 5, 1974.

Bass & Ullman, New York City, for plaintiffs; Milton A. Bass, New York City, of counsel.

Paul J. Curran, U. S. Atty., New York City, for defendants; Naomi L. Reice, Asst. U. S. Atty., of counsel.

FRANKEL, District Judge.

On October 1, 1973, regulations of the Food and Drug Administration became effective requiring that preparations of Vitamin A and Vitamin D in excess of 10,000 IU (international units) per dosage unit and 400 IU per dosage unit, respectively, be restricted to prescription sale and that such vitamins be labeled accordingly. 21 C.F.R. §§ 3.94 and 3.95 (1973). The regulations were declared to have been promulgated to implement the "efficient enforcement" of §§ 502(a), (f), and (j) and 503(b) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 352(a), (f), and (j) and 353(b), under the general authority of the Act's § 701(a), 21 U.S.C. § 371(a), and pursuant to powers delegated to the Commissioner by 21 C.F.R. § 2.-120(a)(1) (1973).

Plaintiffs, involved in the manufacture, distribution, and sale of Vitamins A and D, filed suit on August 6, 1973, seeking declaratory and injunctive relief against the regulations. Their motion for a preliminary injunction was denied on September 25, 1973. National Nutritional Foods Ass'n v. Weinberger, D.C., 366 F.Supp. 1341, aff'd 491 F.2d 845 (2d Cir., 1973).

Defendants have now moved for summary judgment dismissing the complaint. Counsel have made extensive submissions, and the court has heard further oral argument, supplementing the things read and heard on the motion for a preliminary injunction. For reasons hereinafter outlined, the complaint is now to be dismissed.

## I.

Plaintiffs claim that the questioned regulations were issued by the Commissioner without statutory authority. They argue that the legislative history of the prescription drug statute, 21 U.S.C. § 353(b)(1)[1] reveals a purpose to prohibit regulations of this kind. The history shows, plaintiffs say, that the prescription requirement was meant to be for case-by-case determination in court, not for administrative rules like those before us. This intended limitation, they argue, may not be surmounted or avoided by the more general authority of the Commissioner to issue regulations under 21 U.S.C. § 371(a). These contentions have substance. Having considered them, however, the court concludes that the legislative history is by no means clear enough to preclude a look at the statutory text,[2] and that the legislative mandate as a whole sustains the agency's position.

The Food, Drug and Cosmetic Act (the Copeland Act), 21 U.S.C. § 301 et seq., was passed in 1938, superseding a 1906 statute touching the subject (the

---

[1]. "(b)(1) A drug intended for use by man which—

"(A) is a habit-forming drug to which section 352(d) of this title applies; or

"(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or

"(C) is limited by an approved application under section 355 of this title to use under the professional supervision of a practitioner licensed by law to administer such drug,

shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale."

[2]. See Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 100 L.Ed. 412 (1956) (Frankfurter, J.).

Wiley Act, c. 3915, 34 Stat. 768). The new Act was designed to respond to "profound changes in methods of manufacturing and selling foods and drugs" which had developed since 1906 and to remedy "textual weaknesses in the measure that were not foreseen when it was enacted." 79 Cong.Rec. 4758 (remarks of Sen. Copeland); see generally Jackson, Food and Drug Legislation in the New Deal (1970). Section 503(b) of the Act, 21 U.S.C. § 353(b) (the prescription drug statute), was further amended in 1951 by the Durham-Humphrey Amendment, c. 578, 65 Stat. 648 (1951). This amendment and its history are the central subjects of plaintiffs' case.

The general purpose of the 1951 legislation was to adapt the Food, Drug and Cosmetic Act—

> "to deal realistically with the labelling and dispensing of drugs that may be sold only upon the prescription of licensed practitioners. Its provisions are remedial in the sense that they are intended to protect the public from abuses in the sale of potent prescription medicines. They will also relieve retail pharmacists of unnecessary restrictions in the dispensing of drugs that are safe for use without medical supervision." S.Rep. No. 946, 82d Cong., 1st Sess. cited in 1951 U. S.Code Cong. and Admin.Serv. p. 2454.

Accordingly, the amended section 503 created a new prescription requirement encompassing a statutory definition of drugs that may be dispensed only on prescription and specifying the conditions under which these drugs may be dispensed. Before, the law had simply commanded that the labeling of drugs bear adequate directions for use. While the Commission had provided some regulatory suasion,[3] it had been for the drug

manufacturer to make the primary determination as to whether a prescription was necessary; the resulting lack of uniformity had left the retail druggist adrift in identifying his statutory (and health) obligations. One manufacturer might determine that a prescription legend was required for the same drug that a competing manufacturer considered suitable for over-the-counter sale. See H.R.Rep.No.700, 82d Cong., 1st Sess. 3 (1951). As originally proposed, in H. R. 3298, the amended § 503(b) would have conferred authority on the F.D.A. to issue an administrative list of drugs requiring prescription prior to sale. While this provision was opposed by many drug manufacturers, it remained in the bill as reported out by the House Committee on Interstate and Foreign Commerce. Among the considerations which influenced the Committee in its decision to retain this aspect of the bill was the recognition that "the task of determining which drugs shall be sold only on prescription is, in its nature, essentially a legislative or rule-making function, unsuited for solution solely through the judicial process." H.R.Rep.No.700, *supra* at 10.

A minority report asserted that "the present method which leaves this determination [of whether a prescription is required] to the courts, should be left unchanged except that a proper standard to be applied in determining whether a drug is dangerous should be incorporated in the statute." *Id.* at 28. The minority argued that providing the Administrator with power to issue regulations was a "dangerous delegation of authority" which would "add to present difficulties by increased bureaucratic regulation." *Id.*

H.R.3298 reached the floor of the House on July 31, 1951, 97 Cong.Rec. 9235 (1951). The minority view on handling the prescription requirement

---

3. In 1944, the F.D.A. promulgated regulations designed to provide some guidance as to what drugs would be exempted from various warning requirements on their labels if only prescription sale was allowed. These standards were similar to those later incorporated in the Durham-Humphrey Amendment. See 21 C.F.R. § 1.106(b)(1) and (b)(2)(ii) (1949).

gathered support, on stated grounds both of general principle and of specific hostility to the then Administrator. On August 1, Congressman O'Hara of Minnesota introduced an amendment to strike the sections of the bill providing for the promulgation of an administrative list of drugs requiring a prescription for sale. The amendment carried. In its amended form H.R.3298 was passed by the House and sent to the Senate, where it was reported out favorably and passed with minor amendments (and no significant debate) on October 15, 1951.

The Senate Committee which considered H.R.3298 as passed by the House had before it both H.R.3298 and a companion Senate Bill, S. 1186 with various amendments in the nature of a substitute by Senator Humphrey designed to reintroduce the administrative list. While the Committee ultimately accepted the House version, it noted that the statutory definition *simpliciter* would be difficult or impossible to administer. The Committee Report explicitly contemplated the formulation of implementing regulations under 21 U.S.C. § 371(a) to effectuate the statutory objective of protecting the public health:

> "In order to give this general definition a more precise meaning so that it may be applied with greater uniformity by the drug trade the Administrator can exercise the authority he has under section 701(a) of the Federal Food, Drug, and Cosmetic Act to issue interpretative regulations. It is to be understood that the inclusion of the statutory definition does not, of course, in any way derogate from the Administrator's authority to interpret and enforce the definition through the issuance of any regulations necessary or appropriate to protect the public from indiscriminate dispensing of drugs over the counter when they may be unsafe for use without the supervision of a practitioner licensed by law to administer such drugs.

> "As previously stated, the committee considered S. 1186 together with H.R.3298. S. 1186 would have autho-

rized the Federal Security Administrator to list by name or class the drugs which he considered within the statutory definition. The grant of such administrative authority was objected to as an unnecessary regulation of the drug industry, and the committee concluded that administrative listing is not necessary at this time. It was felt that the statutory definition, together with the authority to make interpretative regulations, could bring an end to the existing confusion in drug labeling and that uniformity can be achieved through cooperative efforts of the drug industry and the Food and Drug Administration working under the statutory plan. If the present confusion is not ended by this legislation it will then be time enough to consider the need for the administrative listing approach.

> \* \* \* \* \* \*

> "Furthermore, in determining whether a drug is safe for use without medical supervision, there must be taken into consideration not only the drug's toxicity, but also other potentialities for harmful effect, the method by which it is used and the collateral measures necessary to its safe use. The broad language of the definition contained in this subparagraph is intended to comprehend all drugs that in fact should be administered under medical supervision in order to insure their safe use. *Such difficult borderline cases as may arise under this definition can be dealt with under the interpretative and rule-making power provided for in section 701(a) of the act.*" S.Rep.No.946, 82d Cong., 1st Sess., cited in 1951 U.S.Code Cong. and Admin.Serv. pp. 2457, 2461 (emphasis added).

In these expressions at least, there was a plain understanding that whatever specific rule-making powers were given to the F.D.A., the commissioner would be required and expected to use his § 701(a) power "to promulgate regulations for the efficient enforcement of this Act" in making the prescription re-

quirement effective. As for the House, if it rejected the broad project of an "administrative list," it left § 701(a) intact and nowhere indicated a purpose to render that section inoperative for purposes of the new prescription provision.[4]

■ Wherever the legislative history alone might leave us, the Commissioner's position finds solid support in § 701(a) of the Act, 21 U.S.C. § 371(a), and judicial as well as administrative constructions of this provision. Section 701(a)

empowers the Commissioner, as delegee of the Secretary of Health, Education and Welfare, 21 C.F.R. § 2.120 (1973), "to promulgate regulations for the efficient enforcement of" the Act, including the Act's prescription requirement in § 353(b). Plaintiffs argue this is authority for mere "housekeeping" provisions, and they contrast subsection (e)[5] with subsection (a) of § 701 to buttress the argument.[6] But the contention is not only at war with a considerable body

---

4. Contemporary trade circles recognized that this would be the case as well. See Dunn, The New Prescription Drug Law, 6 Food, Drug, Cosm.L.J. 951, 955–56 (1951).

5. § 701(e), 21 U.S.C. § 371(e) sets up structured procedures for promulgating regulations for specified purposes. Regulations issued under six specified statutes require that any proposed regulations be published by the Secretary. Within 30 days, if objection is received, a public hearing will be held "for the purpose of receiving evidence relevant and material to the issues raised by such objections." The resulting regulations must contain detailed findings of fact and be based on substantial evidence in the record of the hearing. The original Act required that a hearing be held and a public record established before any regulations could be issued or amended. Later amendments allowed regulations meeting no opposition to be promulgated by this expedited mechanism. C. 143, 68 Stat. 55 (1954); c. 861, § 2, 70 Stat. 919 (1956); see Forte, Fair Hearing in Administrative Rule Making: A Recent Experience Under the Federal Food, Drug and Cosmetic and Fair Packaging and Labeling Acts, 1968 Duke L.J. 1, 11–17 Six portions of the Act to which the § 701(e) procedures apply are: § 401, 21 U. S.C. § 341 (establishing definitional identity and quality standards for certain foods); § 403(j), 21 U.S.C. § 343(j) (labeling requirements for special dietary foods); § 404(a), 21 U.S.C. § 344(a) (emergency permit control system); § 406(a), 21 U.S.C. § 346 (establishment of tolerances for poisonous ingredients in food); § 502(d), 21 U.S.C. § 352(d) (designation of habit forming drug derivatives); § 502(h), 21 U.S.C. § 352(h) (packaging requirements for certain drugs). In a number of more recent grants of rulemaking authority to the F.D.A. since the original Act was passed, the use of § 701(e) procedures was mandated by Congress. See, e. g., Fair Packaging and Labeling Act of 1967. 15 U.S.C. §§ 1454, 1455; Federal Hazardous Substances Act of 1960; id. §§

1261, 1262, Color Additive Amendments of 1960, id. § 706.
In other substantive areas Congress recently gave the Secretary of Health, Education and Welfare power to elect whether to issue regulations under § 701(e) or under the less formal procedures of 5 U.S.C. § 553, e. g., Child Protection and Toy Safety Act of 1969, 15 U.S.C. §§ 1261(q), 1262(e)(1); Poison Prevention Packaging Act of 1970, 15 U.S.C. §§ 1471, 1474(a).
The scope of the 701(e) regulations is clear. The House Report on S. 5 (the basis for the 1938 Act) noted that:
  "Such regulations are not merely interpretive. They have the force and effect of law and must be observed. Their violation may result in the imposition of criminal penalties, or in the confiscation of the goods involved if shipped in interstate commerce, or in their exclusion from the country if imported."
H.R.Rep.No.2139, 75th Cong., 3d Sess., as cited in C. Dunn, Federal Food, Drug and Cosmetic Act: A Statement of Its Legislative Record 824 (1938).

6. Plaintiffs argue that § 701(a) regulations are "interpretative" in the sense that they are promulgated without statutory authority and thus lack the force of law. This court accepts with alacrity the authoritative view that it is not profitable to explore the asserted distinction, Toilet Goods Association v. Gardner, 360 F.2d 677, 686 (2d Cir. 1966), aff'd, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), which is "fuzzy at best." Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 930, 959–60 (1965). However labeled, the questioned regulations merit the respect owed an expert agency. See Skidmore v. Swift & Company, 323 U.S. 134, 136–140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). No label can justify the claims, hereinafter considered, that the court should hear and determine these problems of medical and pharmacological judgment de novo.

of administrative practice;[7] it is also contrary to controlling judicial authority. Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), sustained the F.D.A.'s authority under § 701(a) to create an "administrative summary judgment procedure" (p. 617, 93 S.Ct. 2469) having the drastic consequence, in cases to which it applied, of withdrawing approval of new drug applications without an evidentiary hearing. The administrative action was upheld as a valid instance of "particularizing statutory standards through the rulemaking process," [8] deemed necessary and proper to prevent the "paralysis" of the administrative process which "would result if case-by-case battles in the courts were the only way to protect the public against unsafe or ineffective drugs." 412 U.S. p. 626, 93 S.Ct. p. 2481. Equally enlightening, if not technically "square" authority, is the pronouncement in Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 653, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973), that the agency's power to determine "new drug" status in its own administrative proceedings was "implicit in the regulatory scheme" though "not spelled out in *haec verba* . . . ." Again, the construction was powerfully influenced by the recognition that a different view "would seriously impair FDA's ability to discharge the responsibilities placed on it by Congress." CIBA Corp. v. Weinberger, 412 U.S. 640, 643, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973).

Our Court of Appeals has recognized similarly that "the Commissioner has the power to issue binding interpretative regulations," citing to another example of the authority sustained under § 701(a), Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and observing that "the particularization of a statute by rule-making is not only acceptable in lieu of protracted piecemeal litigation . . . but it is the preferred procedure. . . ." CIBA–Geigy Corporation v. Richardson, 446 F.2d 466, 468 (2 Cir. 1971). This principle, applied in the instant case, implements our duty to treat the statute, with its paramount concern for life and health, "as a working instrument of government and not merely as a collection of English words." United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943); see also United States v. Bacto-Unidisk, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969); United States v. Sullivan, 332 U.S. 689, 696, 68

---

7. "The agency has promulgated a substantial number of rules under § 701(a)." Hamilton, Rulemaking on a Record by the Food and Drug Administration, 50 Texas L.Rev. 1132, 1133 n. 10 (1972). Among such regulations of clearly substantive proportions are those governing food nutritional labeling, 21 C.F.R. § 1.17 (1973), information panel labeling requirements, 21 C.F.R. § 1.8(d) (1973), food fat labeling, 21 C.F.R. § 1.18 (1973), specifications of the identity of products which may be sold under specific common or usual names, 21 C.F.R. § 102.1–8 (1973), Good Manufacturing Practice Regulations, 21 C.F.R. § 128 (1973), and the extensive series of review mechanisms encompassing the Over-The-Counter drug review program, 21 C.F.R. § 130.301 (1973).

Wisconsin District Judge James E. Doyle has determined that the Good Manufacturing Practice Regulations specifying standards for "insanitary conditions," 21 C.F.R. 128(a)(A), promulgated under 701(a) are "not to be given automatic and decisive effect" in a criminal proceeding under 21 U.S.C. § 331(a). United States v. Everett Fisheries, Inc., No. 72–Cr.–109 (W.D.Wisc. May 30, 1973). Unlike the instant case, *Everett* was a criminal prosecution. The statutory language allegedly violated through the violation of the regulation was open to a variety of meanings and thus open to interpretation and argument. Cf. Pendergast and McMurray, The Constitutionality of the Good Manufacturing Practices Provision of the Federal Food, Drug & Cosmetic Act, 23 Bus.Lawyer 445, 449–55 (1968); Barnard, Good Manufacturing Practices Regulations in the Food Industry, 22 Food Drug Cosm. L.J. 511, 513–14 (1967). It is also noteworthy that Judge Doyle's decision antedated Weinberger v. Hynson, Westcott & Dunning, considered just below in the text.

8. The words were quoted, 412 U.S. at p. 620, 93 S.Ct. at p. 2478, from FPC v. Texaco, 377 U.S. 33, 39, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), as stating a governing principle.

S.Ct. 331, 92 L.Ed. 297 (1948); Permian Basin Area Rate Cases, 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The recent approval of legislative rulemaking power under a section of the Truth In Lending Act very like § 701(a) in language, Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), adds further support to the Commissioner's position here, as does the D.C. Circuit's determination that the Federal Trade Commission possesses substantive rulemaking power although the statute does not explicitly say so. National Petroleum Refiners Association v. F. T. C., 482 F.2d 672, 676–677, 689–691 (D.C.Cir. 1973), pet. for cert. filed, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1973) (No. 806).

If the foregoing citations do not dictate mechanically the result herein, they point the clear path to decision. The "case-by-case battles in the courts" deemed compulsory by plaintiffs would have to be borne if the law required them. The result would be, of course, a rickety apparatus of non-regulation, with judges making disparate and uninformed decisions about when prescriptions should or should not be required. Such de novo court hearings could in no way inure "to [those] interests of the public that Congress was anxious to protect," Weinberger v. Bentex Pharmaceuticals, et al., 412 U.S. 645, 653, 93 S. Ct. 2488, 2494, 37 L.Ed.2d 235 (1973). It seems fortunate that the Act, read sensibly and as a whole, requires no such unhappy interpretation.

## II.

■ Plaintiffs contend that they should have a de novo "trial," preceded by considerable discovery, to test the questioned regulations. There is no warrant for such explorations or for an evidentiary hearing of any kind. The agency was not required to hold a trial-type hearing before issuing its regulations, and none is either required or permitted in the court. It is sufficient that the public, including the plaintiffs, were "given a significant opportunity prior to promulgation of . . . [the] . . . rule[s] to ventilate the policy and empirical issues at stake through written submissions." National Petroleum Refiners Association v. Federal Trade Comm., 482 F.2d 672, 692 (D.C. Cir. 1973), pet. for cert. filed, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (No. 806). Unlike the rare cases in which the absence of an administrative record may require the taking of evidence in court, e. g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419–420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), there is a voluminous and unstinting record here. Some 46 volumes in size, "it consists of the submissions made in response to the invitations issued for written comments." Automotive Parts & Accessories v. Boyd, 132 U.S.App.D.C. 200, 206, 407 F.2d 330, 336 (1968). Plaintiffs had full opportunity to present everything they thought germane. The agency, referring to the extensive materials it received, has sufficiently "articulate[d] its bases and purposes" in promulgating the regulations. Buckeye Power, Inc. v. EPA, 481 F.2d 162, 170–171 (6th Cir. 1973); see also Associated Indus. of N. Y. S., Inc. v. Dept. of L., 487 F.2d 342, 354 (2d Cir. 1973); Mobil Oil Corporation v. Federal Power Commission, 152 U.S.App.D.C. 119, 469 F.2d 130, 140 (1972), cert. den., 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973); International Engineering Company v. Richardson, 361 F.Supp. 818, 823–825 (D.D.C.1973).

■ In rulemaking of this sort, where the regulations must stand unless they are deemed irrational or arbitrary and capricious, Associated Indus. of N. Y. S., Inc. v. Dept. of L., 487 F.2d 342, 348 (2d Cir. 1973); Bunny Bear, Inc. v. Peterson, 473 F.2d 1002, 1005–1006 (1st Cir. 1973); Unimed, Inc. v. Richardson, 147 U.S.App.D.C. 368, 458 F.2d 787, 789 (1972); Boating Industry Association v. Boyd, 409 F.2d 408, 411 (7th Cir. 1969); Citizens Band Association v. United States, 375 F.2d 43, 53–54 (9th Cir. 1967), it would be "sufficient that the

regulations be supported by evidence in [the Commissioner's] files, or even by [his] experience." Consumers Union of United States, Inc. v. Consumer Product Safety Commission, 491 F.2d 810, at 812 (2d Cir. 1974). The case against plaintiffs is far stronger; in this domain of medical judgment, where certainty is not attainable and special caution to safeguard health is compelled, the prudent and easily managed restrictions the Commissioner has required are solidly supported by the materials that were before him and have been lodged with the court.

In any case it is clear that the main, if not the exclusive, object plaintiffs pursue is an exploration of the mental processes by which the Commissioner reached his results. Such explorations are rarely to be countenanced. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); see also National Nutritional Foods Association v. Food and Drug Administration, 491 F.2d 1141 (2d Cir. 1974), especially when, as here, the Commissioner's rationale is sufficiently articulated to allow for meaningful judicial review. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971). No showing has been made to justify the extraordinary inquiry plaintiffs propose.

It is abundantly clear, then, that the court should, and it does, vacate plaintiffs' notice to depose defendant Commissioner or his designees at an examination to which deponents would be required to bring "any and all books, correspondence, records, medical reports and literature relating to their determination of the dosage levels of Vitamins A and D which are in issue . . . ." In sum, there are no factual issues to be tried. The administrative record was properly made. It is in no pertinent sense incomplete. It leads, as has been stated, to a ruling that the regulations are by no means arbitrary, capricious, or otherwise infirm. In so holding, the court has reconsidered the propositions of law underlying the deni-al of a preliminary injunction. Those premises are now adhered to and reaffirmed.

Plaintiffs' notice of deposition is vacated. Defendants' motion for summary judgment is granted. The complaint is dismissed.

So ordered.