HUMANA OF VIRGINIA, INC. d/b/a
St. Luke's Hospital et al.

v.

BLUE CROSS OF VIRGINIA et al.

Civ. A. No. CA77–0588–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 31, 1978.

Andrew J. Ellis, Jr., Russell V. Palmore, Jr., Mays, Valentine, Davenport & Moore, G. H. Gromel, Jr., Jos. M. Spivey, III, Hunton & Williams, Richmond, Va., for plaintiffs Chippenham Hospital, et al.

Charles F. Witthoefft, Richmond, Va., for plaintiff St. Elizabeth's Hospital.

Edwin P. Munson, Blue Cross of Virginia, Richmond, Va., for Blue Cross of Virginia.

Robert W. Jaspen, Asst. U. S. Atty., Richmond, Va., Vicki L. Schulkin, Robert P. Jaye, David Smith, U. S. Dept. of Health, Education, & Welfare, Washington, D. C., for Califano.

## MEMORANDUM

MERHIGE, District Judge.

In these consolidated actions, four in number, plaintiffs challenge a regulation promulgated by the Department of Health, Education and Welfare (HEW). The four plaintiffs, all of which are Virginia corporations with their principal places of business in Richmond, Virginia, are: Humana of Virginia, Inc., doing business as St. Luke's Hospital; St. Elizabeth's Hospital, Inc., which owns and operates St. Elizabeth's Hospital and leases and operates Grace Hospital; Chippenham Hospital, Inc.; and Johnston-Willis Hospital, Inc. All four plaintiffs are providers of services under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (hereinafter referred to as the "Medicare Program").

Defendant Blue Cross of Virginia is a Virginia corporation that serves as a physical intermediary in the administration of the Medicare Program. Defendant Mutual of Omaha Insurance Company is a Nebraska corporation doing business in Richmond, Virginia, and is likewise a physical intermediary in the administration of the Medicare Program. Defendant Joseph A. Califano, Jr. is the Secretary of HEW (hereinafter the Secretary) and is responsible for the implementation and administration of the Medicare and Medicaid Programs.

Jurisdiction vests in the Court by virtue of 28 U.S.C. § 1331, 5 U.S.C. §§ 701 *et seq.* The matter comes before the Court after a full trial on the merits. For the reasons that follow, judgment will be entered for the plaintiffs.

The basic dispute in the instant litigation concerns the legality of an HEW regulation that requires plaintiffs to disclose to members of the public upon request the "provider cost reports," which must be filed with Blue Cross as a condition of plaintiffs' participation in the Medicare Program. These cost reports contain detailed financial information that plaintiffs do not usually disclose for the public and for obvious business purposes would prefer to keep confidential. However, the challenged regulation, found at 20 C.F.R. § 422.435, provides for disclosure as follows:

The following shall be made available to the public under the conditions specified:

. . . . .

(c) upon a request in writing, cost reports submitted to providers of services pursuant to § 1815 of the Act to enable the Secretary to determine amounts due such providers.

Pursuant to this regulation, a news reporter for a Richmond, Virginia, television station filed a written request with defendant Blue Cross seeking copies of the provider cost reports of all plaintiffs. Blue Cross notified all plaintiffs that it intended to comply with the request, in accordance with Medicare guidelines. The plaintiffs thereupon filed separate actions, now consolidated here, seeking to enjoin defendants from dis-

closing these provider cost reports to any third person.[1]

Plaintiffs contend that the Secretary's regulation contravenes exemption 4 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4), which specifies that the disclosure provisions of FOIA do not apply to matters that are: "(4) trade secrets and commercial *or financial information* obtained from a person and privileged or *confidential.*" [Emphasis added]. In the holdings of the United States Court of Appeals for the Fourth Circuit, information that is exempt from disclosure under exemption 4 is prohibited from disclosure under 18 U.S.C. § 1905.[2] *Westinghouse Electric Corp. v. Schlesinger,* 542 F.2d 1190, 1207 (4th Cir. 1976), *cert. denied sub nom. Brown v. Westinghouse Electric Corp.,* 431 U.S. 924, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977). Moreover, the FOIA itself "confers on a supplier of *private* information, an implied right to invoke the equity jurisdiction to enjoin the disclosure of information within Exemption 4." 542 F.2d at 1210.[3] Under the holdings of this judicial circuit, therefore, the instant plaintiffs are entitled to injunctive relief prohibiting disclosure of their cost reports, as well as a declaratory judgment that the challenged HEW regulation is invalid, if they show, as they have in the instant case, that the cost reports fall within the scope of exemption 4 of the FOIA.

There is no dispute that the cost reports contain commercial and financial information. The question is simply whether or not this information is "confidential" within the meaning of exemption 4. Under the accepted standard, a commercial or financial matter is confidential under exemption 4 " 'if disclosure of the information is likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained.' " *Westinghouse Electric Corp. v. Schlesinger, supra,* at 1207 n. 55 (quoting *National Parks and Conservation Ass'n. v. Morton,* 162 U.S. App.D.C. 223, 228, 498 F.2d 765, 770 (1974). In the instant case, the evidence compels the conclusion that disclosure of plaintiffs' cost reports would cause substantial harm to their respective competitive positions, and that these reports therefore are "confidential."

At the outset, defendants admit that the plaintiff hospitals are in competition and that public disclosure of plaintiffs' cost reports *may* cause them competitive harm. A stipulation of facts between Chippenham and Johnston-Willis Hospitals and the defendants reads, in relevant part, as follows:

Chippenham and Johnston-Willis Hospitals compete with other hospitals and health care providers in the Richmond area for, among other things, patients, medical staff and medical equipment. Chippenham and Johnston-Willis have attained profitable market positions, as evi-

---

1. A similar series of events gave rise to the consolidated action against Mutual of Omaha, CA–77–0746–R.

2. 18 U.S.C. § 1905 provides:
   Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

3. The Court is well aware that several circuits have disagreed with the United States Court of Appeals for the Fourth Circuit's interpretation of law in this regard. *See Sears, Roebuck and Co. v. Eckerd,* 575 F.2d 1197 (7th Cir. 1978); *General Dynamics Corp. v. Marshall,* 572 F.2d 1211 (8th Cir. 1978); *Chrysler Corp. v. Schlesinger,* 565 F.2d 1172 (3rd Cir. 1977). This Court, however, is duty-bound to follow the law as enunciated by its Court of Appeals.

denced by occupancy rates in 1976 of approximately 90% for Chippenham and approximately 85% for Johnston-Willis, through skill and expertise in hospital management. These profitable market positions may be damaged by disclosure to the public of these plaintiffs' Medicare cost reports. The information contained in the cost reports is financial information concerning the hospital's operations that could be used by existing or potential competitors to the hospitals' detriment. For example, the cost reports contain a balance sheet, a profit and loss statement, a schedule allocating each and every cost item to a revenue producing department, a schedule showing the revenue ·and costs of each department, and schedules showing out-patient revenues and expenses, hospital-based physician remuneration, employee benefits, and administrative costs. From this data costs and revenues per patient day by department, staffing patterns and profit margins for all departments of the hospitals may be derived. From this data, existing competitors could learn, among other things, what salaries are paid to the administrator of each hospital and in the aggregate to the employees of each department of each hospital, thus facilitating personnel rating (for departments consisting of a single individual, this would mean that the salary of that individual would be disclosed.) In addition, existing competitors could learn how Chippenham and Johnston-Willis are organized and staffed. This information could help the competitors identify areas in their own operation that could be curtailed or increased and assist them in luring patients and doctors away from Chippenham and Johnston-Willis. Potential competitors who were considering constructing a hospital or opening a service, such as a clinical laboratory, could use the information in the cost reports to analyze the earnings potential of a particular service and thus assist them in deciding whether to compete. There is a certificate of need law in Virginia found at § 32–211.3, et seq., Code of Virginia, 1950 as amended. If the potential competitors enter the market they may dilute Chippenham's and Johnston-Willis' share of the market by attracting away their patients and doctors. Suppliers of goods and services to the hospitals could, through information from the cost reports, improve their bargaining position to the detriment of Chippenham and Johnston-Willis.

A virtually identical stipulation has been filed by plaintiffs Humana and St. Elizabeths and the defendants.

In the face of these stipulations—that the release of plaintiffs' cost reports could cause harm to plaintiffs' competitive positions—defendants were reduced to two arguments: (1) a disclosure of the cost report was not likely to cause harm, and (2) any harm caused would not be substantial. In the Court's view, however, the evidence adduced at trial effectively rebuts both arguments.

Plaintiffs' sole witness was Mr. John H. Tobin, Jr., currently a vice president of the Hospital Corporation of America (HCA), which wholly owns both the Chippenham and Johnston-Willis Hospitals. Formerly, from 1971 to 1976, Mr. Tobin served as the administrator of Johnston-Willis Hospital. His testimony was to the effect that the provider cost reports sought under the challenged HEW disclosure regulation constituted a virtual "financial blue print" of hospital operations. Based on his past experience in the hospital field in Richmond, Mr. Tobin concluded that release of the plaintiffs' cost reports would cause substantial harm to the competitive positions of the plaintiff hospitals. This opinion was premised on several specific concerns. First, Mr. Tobin was of the view that salary information in the cost reports would lead to employee raiding by other hospitals. Second, he believed that the techniques used by the plaintiff hospitals to maximize lawful Medicare reimbursements and minimize operating costs would be reflected in the cost reports as a whole. Third, he feared that release of the cost reports could induce new competitors to enter the hospital field in Richmond.

On cross examination, the defendants established that individual patients probably would not be influenced by the cost reports, primarily because the choice of a hospital is under ordinary circumstances made by physicians rather than patients. However, Mr. Tobin's responses to questions about competition among hospitals for nurses and doctors indicated that the market for employees in the health field is highly competitive and that public availability of staffing and salary information contained in cost reports would harm the plaintiffs' negotiating position with nurses and doctors. Additionally, Mr. Tobin was of the view that the unauthorized release of his hospital's cost reports in 1975 had enabled Touche, Ross and Co. to compile, in a much shorter time than usual, a highly accurate feasibility study that aided Richmond Metropolitan Hospital in obtaining a certificate of need required for renovation and new construction now under way at that competing hospital.

The defendants, on the other hand, produced a Professor of the New York University School of Law, Sylvia Law, a widely recognized expert in the health field and author of the book *Blue Cross: What Went Wrong?* (1974). Professor Law testified that hospitals do not "compete" with each other in the traditional economic sense. The major reason for this, she explained, was that hospitals are reimbursed by Medicare and other insurors on a cost basis. In her view, such cost-based reimbursements generated "reverse" competition among hospitals because the hospitals had no incentives to hold down costs. Given this framework of perverse competition, it was Ms. Law's opinion that public disclosure of the hospitals' cost reports would not cause substantial harm to the hospitals' competitive positions.

It was established on cross examination, however, that Ms. Law agreed that her theory did not apply to the extent that reimbursement by insurors were based on charges rather than costs. Additionally, she indicated that approximately half of all hospital revenues nationally were from 300 private insurance companies (not including Blue Cross), many of which reimbursed on a charge basis. Additionally, the Professor frankly stated that she had no specific familiarity with Richmond area hospitals.

Mr. Gordon R. Cumming, Executive Director of the California Health Facility Commission, a fifteen member commission appointed by the Governor of that state to establish accounting and reimbursement practices, was also called by the defendants to the stand. Mr. Cumming's testimony revolved around California's hospital disclosure act, which mandates extensive public disclosure of hospital financial information—more extensive, in his opinion, than the disclosure that plaintiffs seek to enjoin in the instant case. The gist of Mr. Cumming's testimony was to the effect that despite such extensive mandatory disclosure in California, he had heard no complaints or objections by hospitals in the year and some months since the disclosure law took effect. He was of the view that they would "absolutely not" suffer substantial harm if their Medicare cost reports were released.

Mr. Cummings did acknowledge, however, that it was still too soon to tell whether the California law would prove harmful to the competitive posture of the affected hospitals. He was also of the view that if a hospital wished to persist in what he considered to be an unwise or perverse form of competition, access to the Medicare cost reports of hospitals would help that hospital to compete more effectively.

Defendants' final expert witness was Mr. Fred G. Overstreet, Executive Director of the Central Virginia Health Systems Agency (CVHSA), an agency designed to coordinate planning for hospitals by making recommendations under Virginia's certificate of need law. Under the certificate of need law, any hospital expansion, relocation, or major change in construction or equipment, or any new hospital facility, requires state approval. This requirement places restraints upon hospitals and prevents them from competing in the traditional economic sense, and so Mr. Overstreet testified that

enforcement of the certificate of need law is hampered by the inaccuracy of currently available information.[4] For that reason, Mr. Overstreet was of the view that release of Medicare cost reports would be helpful to his agency for planning purposes, but would not influence the behavior of patients or doctors.

It developed on cross examination, however, that Mr. Overstreet had never held a management position at a hospital, had never prepared a hospital budget, and in fact had never seen a completed Medicare cost report. He also acknowledged that a completed cost report could help a competitor to strengthen an application for a certificate of need.

It should be pointed out that Mr. Tobin, upon being recalled to the stand as a rebuttal witness, made two significant points. First, he noted that even cost-based reimbursements under Medicare did not cover certain costs of patient care, such as television, cafeteria, and telephone services. Second, he testified that charge-based reimbursement from private insurers accounted for 55% of all revenues at Chippenham Hospital and 35% of all revenues at Johnston-Willis Hospital. He was of the view that these charged-based reimbursements, not Medicare, generated the hospitals' profits.

Considering all of the evidence introduced, the Court concludes that release of plaintiffs' Medicare cost reports would be likely to cause substantial harm to their respective competitive positions. The stipulations indicate that plaintiffs have been relatively successful in achieving profitable market positions. Mr. Tobin's testimony indicated the release of the plaintiffs' cost reports would jeopardize these favorable positions by decreasing management's negotiating leverage with employees, by revealing to competitors the plaintiffs' highly developed techniques for minimizing operating costs and maximizing lawful Medicare

reimbursements, and by making it easier for actual or potential competitors to obtain certificates of need to construct competing hospital facilities.

Nothing in the testimony of the defendants' witnesses has refuted this conclusion of Mr. Tobin. Professor Law and Mr. Cumming indeed have persuaded the Court that hospitals compete in a non-traditional manner that is often contrary to the public interest, but the Court has not been persuaded that plaintiffs would not suffer substantial harm if their Medicare cost reports were released. In light of these conclusions, the Court is duty bound to hold that the plaintiffs' Medicare cost reports contain confidential financial information and therefore are protected from disclosure by exemption 4 of the FOIA. *See Westinghouse Electric Corp. v. Schlesinger, supra.*

The Court's decision in the instant case is in accord with numerous other holdings on precisely the same issue. *See Westchester General Hospital, Inc. v. Dept. of Health, Education and Welfare,* 434 F.Supp. 435 (M.D.Fla.1977); *Parkridge Hospital v. Blue Cross and Blue Shield of Tennessee,* 430 F.Supp. 1093 (E.D.Tenn.1977); *Circle Terrace Hospital Corp. v. Group Hospitalization, Inc.,* No. CA–77–487–A, (E.D.Va., Sept. 7, 1977); *The Diplomat Lakewood Inc. v. Blue Cross of Northeast Ohio,* No. C77–718 (N.D.Ohio, Nov. 25, 1977).

An appropriate order shall issue.

---

4. This evidence of course is directly contra to the conclusion of Mr. Cumming that disclosure of the cost reports could not be harmful to plaintiffs in light of the fact that all of the information in said reports was already available.