ST. JOSEPH'S HOSPITAL HEALTH
CENTER, Plaintiff,

v.

BLUE CROSS OF CENTRAL NEW
YORK, INC., Service Employees International Union, AFL–CIO and Joseph A.
Califano, Jr., as Secretary of the United
States Department of Health, Education
and Welfare, Defendants.

No. 79–CV–416.

United States District Court,
N. D. New York.

July 11, 1979.

Charles E. Cooney, Jr., Costello, Cooney & Fearon, Syracuse, N.Y., for plaintiff.

Bruce G. Soden, Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N.Y., for defendant Blue Cross of Central New York, Inc.

Charles E. Blitman, Blitman & King, Syracuse, N.Y., for defendant Service Employees International Union, AFL-CIO.

George H. Lowe, U.S. Atty., Syracuse, N.Y., Gustave J. DiBianco, Asst. U.S. Atty., Syracuse, N.Y., for defendant Califano.

## MEMORANDUM—DECISION AND ORDER

MUNSON, District Judge.

This is an action to enjoin agency disclosure in response to a Freedom of Information Act request. The information to be disclosed is arguably exempt from the Act's mandatory disclosure requirements, but a regulation promulgated by the Secretary of Health, Education and Welfare would nevertheless compel its release. St. Joseph's Hospital challenges the validity of this rule, arguing that it is "arbitrary, capricious, an abuse of discretion," and otherwise "not in accordance with the law." The

Court's jurisdiction over this dispute is properly founded upon 28 U.S.C. § 1331. *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

St. Joseph's Hospital is a "provider" of medicare services. 42 U.S.C. § 1395 et seq. As a medicare participant, the hospital is reimbursed for these services by the Health Care Finance Administration.[1] However, neither the Health Care Finance Administration nor the Department of Health, Education and Welfare provides payment and accounting services. These functions are performed by Blue Cross of New York.[2]

As a participant in the Medicare program, St. Joseph's Hospital is required to file an annual financial report with Blue Cross and the Department of Health, Education and Welfare. This "cost report" outlines the Hospital's financial standing and details its areas of expenditure during the preceding year. Once submitted, the report, of course, becomes agency data which is subject to disclosure under the Freedom of Information Act.

St. Joseph's Hospital is currently being solicited by organizers of the Service Employees International Union, AFL–CIO. This labor organization hopes to attain recognition as the exclusive bargaining representative of the Hospital's nonsupervisory employees. Believing that statistics concerning the employer's salary schedules, priorities, and profits would be useful in its organizing campaign, the union has demanded a copy of the 1978 St. Joseph's Hospital "cost report" pursuant to the Freedom of Information Act. H.E.W. regulations authorize full disclosure of this information,[3] and the Secretary promptly notified the Hospital of the Department's intention to comply with the union's request. The present action was then commenced,

seeking preliminary and permanent injunctive relief to restrain compliance by either H.E.W. or its agent Blue Cross. This Court granted a temporary restraining order and the government moved to dismiss plaintiff's complaint for failing to state a claim upon which relief could be granted. Since matters outside the pleadings were submitted by the parties, the Court announced its intention to treat the government's motion as one for summary judgment. F.R.Civ.P. 12(b).

The 1978 St. Joseph's Hospital cost report contains, among other things, a balance sheet, a profit and loss statement, a schedule allocating each cost item to a revenue producing department, a schedule setting forth the revenues and costs of each department, and schedules showing out-patient revenues, hospital based physician remuneration, employee benefits and administrative costs. Plaintiff argues that the Freedom of Information Act, 5 U.S.C. § 552, prohibits disclosure of this information because it is exempted by 5 U.S.C. § 552 (b)(4). As noted below, the exemptions contained in the Freedom of Information Act do not themselves forbid voluntary compliance with a "FOIA" request. The Court must therefore address plaintiff's argument that the H.E.W. regulation mandating disclosure of medicare provider "cost reports" contravenes the Trade Secrets Act—a provision in Title 18 which broadly prohibits government disclosure of commercial or financial information, except as otherwise authorized by law. 18 U.S.C. § 1905.

The United States Supreme Court has recently stated that administrative regulations may exempt agency disclosure from the prohibition of 18 U.S.C. § 1905 if (a) the regulations are substantive in nature, (b) the disclosure which they authorize is contemplated by a grant of congressional au-

---

1. On March 8, 1977, responsibility for administration of the Medicare program was transferred from the Social Security Administration to the newly-created Health Care Finance Administration. 42 F.Reg. 13262.

2. 42 U.S.C. § 1395h.

3. 20 C.F.R. § 422.435(c) provides:

The following shall be made available to the public under the conditions specified:

. . . .

(c) Upon request in writing, cost reports submitted by providers of services pursuant to section 1815 of the Act to enable the Secretary to determine amounts due such providers.

thority, and (c) the requisite procedural formalities were observed during their promulgation. *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Inasmuch as 20 C.F.R. § 422.435(c) satisfies each of these criteria, the regulation under attack does not contravene the Trade Secrets Act, and the final section of this opinion shall be devoted to plaintiff's argument that the Secretary's disclosure regulation is "arbitrary, capricious, [and] an abuse of discretion."

## I.

The Freedom of Information Act was enacted in 1966, and became effective one year later. It was the culmination of a continuing congressional effort to improve public access to information held by government agencies. The Freedom of Information Act amended the public information provisions of the Administrative Procedure Act by eliminating direct interest as a condition of obtaining information,[4] narrowing the standards for concealing information, and providing for judicial review of agency decisions to withhold information. *See Generally*, Note, The Freedom of Information Act: A Seven Year Assessment, 74 Colum.L.Rev. 895, 896–898 (1974).

■ The Freedom of Information Act embodies a general philosophy of full agency disclosure. *See Department of Air Force v. Rose*, 425 U.S. 352, 360–361, 96 S.Ct. 1592, 1598–1599, 48 L.Ed.2d 11 (1976); *Environmental Protection Agency v. Mink*, 410 U.S.

73, 80 & n.6, 93 S.Ct. 827, 832 & n.6, 35 L.Ed.2d 119 (1973). Section 552(a) provides that each agency shall make its records available to the public, subject to the requirement that the parties seeking disclosure reasonably describe the information being sought and assume the cost of its reproduction. The Act also exempts nine categories of agency records from the rule of mandatory disclosure. 5 U.S.C. § 552(b). Although several earlier opinions had concluded that these exemptions precluded agency release of exempted data, *see Continental Oil Co. v. Federal Power Commission*, 519 F.2d 31 (5th Cir. 1975); *Westinghouse Electric Corp. v. Schlesinger*, 542 F.2d 1190 (4th Cir. 1976), it is now clear that these exemptions merely remove certain classes of information from the Act's otherwise mandatory disclosure requirements. *Chrysler Corporation v. Brown*, 441 U.S. 281, 290–293, 99 S.Ct. 1705, 1711–1713, 60 L.Ed.2d 208 (1979). An agency is therefore free to disclose exempted materials, subject to the usual limitations on agency action, *Pennzoil v. Federal Power Commission*, 534 F.2d 627 (5th Cir. 1976); *General Dynamics Corp. v. Marshall*, 572 F.2d 1211 (8th Cir. 1978); *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172 (3d Cir. 1977); *Charles River Park "A", Inc. v. Dept. of Housing and Urban Development*, 171 U.S.App.D.C. 286, 519 F.2d 935 (1975); and the Freedom of Information Act would not bar disclosure of the Hospital's cost report even if it fell within the exemption for confidential commercial or financial information.[5]

---

4. Compare 5 U.S.C. § 552(a)(3) with Act of June 11, 1946, ch. 324 § 3(c), 60 Stat. 238.

5. 5 U.S.C. § 552(b)(4) exempts the following records from the mandatory disclosure requirements:

> (b) [FOIA] does not apply to matters that are—
>
> .    .    .    .    .
>
> (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential  .    .    . .

*Charles River Park "A", Inc. v. Dept. of Housing and Urban Development, supra* sets forth the most widely accepted criteria for determining whether information falls within this exemption. There, the Court held that commercial or financial records would be regarded

as confidential within the meaning of the trade secrets exemption if disclosure would have either of the following effects: (a) it would impair the government's ability to obtain necessary information in the future, or (b) it would cause substantial harm to the competitive position of the person from whom the information was obtained. *Id.* at 940.

The cost report at issue in this case clearly contains detailed commercial and financial information. While the Hospital's administrator avers that disclosure of this information will impair St. Joseph's competitive position, it has been repeatedly argued that such information is equally available from other sources. However, because the Freedom of Information Act would not preclude disclosure of the "cost report" even if it contained confidential commer-

## II.

The Department of Health, Education and Welfare has specifically authorized disclosure of cost reports filed by hospitals participating in the Medicare program. 20 C.F.R. § 422.435(c). The applicable provision states:

> The following shall be made available to the public under the conditions specified:
>
> .    .    .    .    .
>
> (c) Upon request in writing, cost reports submitted by providers of services pursuant to section 1815 of the Act to enable the Secretary to determine amounts due such providers.

Plaintiff, however, argues that the regulation is invalid because it contravenes the Trade Secrets Act, 18 U.S.C. § 1905, which forbids government employees from disclosing:

> .    .    . to any extent not authorized by law any information coming to him in the course of his employment or official duties    .    .    . or [any] report or record made to or filed with, such department .    .    . which information concerns or relates to the trade secrets,    .    .    . operations,    .    .    . or    .    .    . confi-

dential statistical data, amount or source of any income, profits, losses, or expenditures of any    .    .    . corporation .    .

As in past cases, the Secretary contends that H.E.W.'s regulation mandating disclosure is entitled to the force and effect of law thereby providing the authorization necessary to legalize release of hospital cost reports under the Trade Secrets Act.[6]

In precisely this context the United States Supreme Court has recently indicated that properly promulgated agency regulations may provide the authorization necessary to exempt an otherwise illegal disclosure from the Trade Secrets Act. *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). However, to enjoy the "force and effect of law," the Court has indicated that the regulation must be authorized by Congress, possess certain "substantive" characteristics, and be the product of certain procedural requisites. *Id.* at 301, 99 S.Ct. at 1717. Thus, in determining whether the Trade Secrets Act precludes disclosure in this case, the Court must determine whether § 422.435(c) satisfies each of these criteria.

cial and financial information within the meaning of 5 U.S.C. § 552(b)(4), the Court need not resolve this factual issue and shall assume that information contained in the Hospital's cost report would otherwise be exempt.

6. Disclosure of medicare costs reports has been challenged in a number of reported cases antedating the Supreme Court's opinion in *Chrysler Corp. v. Brown, supra.* In three of these cases the provider's application for injunctive relief was denied. *Westchester General Hospital, Inc. v. Califano*, 464 F.Supp. 236 (M.D.Fla. 1979); *St. Mary's Hospital, Inc. v. Califano*, 462 F.Supp. 315 (S.D.Fla.1978); *Doctor's Hospital of Sarasota, Inc. v. Califano*, 455 F.Supp. 476 (M.D.Fla.1978). In three other reported cases, disclosure was enjoined. *Humana of Virginia, Inc. v. Blue Cross of Virginia*, 455 F.Supp. 1174 (E.D.Va.1974); *Parkridge Hospital, Inc. v. Califano*, 430 F.Supp. 1093 (E.D.Tenn.1977); *McCoy v. Weinberger*, 386 F.Supp. 504 (W.D. Ky.1974). However, in light of the *Chrysler* opinion, the latter decisions can no longer be regarded as persuasive authority. For example, disclosure was enjoined in *McCoy v. Weinberger, supra,* because the Court found the cost reports exempt within the meaning of 5 U.S.C.

§ 552(b)(4). In these circumstances, it held that disclosure would exceed the applicable regulations and contravene the Freedom of Information Act. Since it is now clear that the Freedom of Information Act does not preclude voluntary disclosure, and the disclosure, at issue in that case antedated the regulations at issue here, this decision can offer very little guidance. Likewise, in *Humana of Virginia, Inc. v. Blue Cross of Virginia, supra,* the Court concluded that medicare provider cost reports fell within the (b)(4) exemption and, as a result, that disclosure was barred by 18 U.S.C. § 1905. However, inasmuch as the Supreme Court has subsequently ruled that a valid substantive agency regulation may provide the "authorization" necessary to relax the prohibition of 18 U.S.C. § 1905, the *Humana* opinion can no longer be regarded as dispositive. Finally, the persuasive value of the *Parkridge Hospital* opinion has been similarly diminished by the fact that the district court was understandably unable to anticipate the *Chrysler* ruling and failed to undertake its three-part analysis to determine whether 20 C.F.R. § 422.435(c) was entitled to the "force and effect of law."

## A.

The Administrative Procedure Act does not define "substantive" agency rules. The Act does, however, distinguish them from "interpretive" rules, and further definition may be derived by negative inference.[7] In addition, the United States Supreme Court has described a substantive or "legislative-type" rule as one affecting individual rights and obligations. *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974). Because the regulation at issue here governs the public's right to know as well as the Hospital's "confidentiality rights," there can be little doubt that § 422.435(c) constitutes a "substantive" regulation, at least insofar as that term has been judicially defined. *Chrysler Corp. v. Brown*, 441 U.S. at 301, 99 S.Ct. at 1717.

■ Nevertheless, the fact that an agency regulation may be characterized as "substantive" does not alone entitle it to the "force and effect of law." Since the legislative power of the United States is vested in Congress, an agency's exercise of quasi-legislative authority must be congressionally authorized and executed in accordance with whatever limitations that branch of government has seen fit to impose. *Batterton v. Francis*, 432 U.S. 416, 425 n.9, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *Morton v. Ruiz, supra* 415 U.S. at 232, 94 S.Ct. at 1073; *National Labor Relations Board v. Wyman-*

*Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969). Accordingly, the Court must now consider whether § 422.435(c) is the product of a congressional grant of legislative authority; and if so, whether the procedural requirements set forth in the Administrative Procedure Act has been complied with.

## B.

In promulgating 20 C.F.R. § 422.435(c), the Secretary relied upon the congressional authorization conferred by sections 405, 1302, and 1306 of Title 42. (40 F.Reg. 27649). Sections 405[8] and 1302[9] are, however, nothing more than "housekeeping" statutes which authorize the Secretary to promulgate what the Administrative Procedure Act terms "rules of agency practice or procedure" as opposed to "substantive" rules.[10] Furthermore, the Secretary cites nothing in the legislative history of these provisions which would indicate that they were intended to serve as a substantive grant of legislative power to promulgate rules authorizing the release of trade secrets or confidential business information. Consequently, neither Section 405 nor Section 1302 can be regarded as authorizing the Secretary to promulgate regulations limiting the scope of Section 1905. *Chrysler Corp. v. Brown*, 441 U.S. at 312, 99 S.Ct. at 1723; *Charles River Park "A", Inc. v.*

---

**7.** 5 U.S.C. § 553(b), also *Chrysler Corp. v. Brown*, 441 U.S. at 301 n.31, 99 S.Ct. at 1717 n.31.

**8.** 42 U.S.C. § 405(a) provides:
(a) The Secretary shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

**9.** 42 U.S.C. § 1302 provides:
The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health, Education and Welfare, respectively, shall make and publish such rules and regulations, not inconsistent with this chapter, as may be

necessary to the efficient administration of the functions with which each is charged under this chapter.

**10.** Compare 5 U.S.C. § 301:
The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.
The Supreme Court has observed that the plain language of this provision merely grants an agency authority to regulate its own affairs. As a result, it could not serve as authority to limit the scope of Section 1905. *Chrysler Corp. v. Brown*, 441 U.S. at 308, 99 S.Ct. at 1721.

*Dept. of Housing and Urban Development,* 519 F.2d 935, 942–943 (D.C.Cir.1976).

Section 1106 of the Social Security Act, 42 U.S.C. § 1306, does, however, provide such authorization. In pertinent part, it states:

> No disclosure . . . of any file, record, report or other paper, or any information, obtained at any time by the Secretary of Health, Education, and Welfare . . . in the course of discharging [his] . . . duties under this chapter . . . shall be made except as the Secretary of Health, Education, and Welfare . . . may by regulations prescribe.

The congressional intent behind this provision first became an issue in Freedom of Information Act cases when private parties sought to obtain medicare survey reports. The agency defended against such suits arguing that Section 1306 provided a specific statutory exemption from the Freedom of Information Act's mandatory disclosure requirements. The Third Circuit Court of Appeals rejected this argument, holding that Section 1306 was not within the scope of the third exemption because it neither identified the class of items that Congress considered appropriate for exemption nor

established guidelines which the Secretary was required to follow in determining what materials should be excluded from its terms. The Court also indicated that Section 1306 could not be regarded as specifically exempting survey reports, based upon the assumption that this provision was only intended to shield H.E.W. information concerning individuals. *Stretch v. Weinberger,* 495 F.2d 639 (3d Cir. 1974). Two other circuits cited this conclusion with approval before the issue became academic as a result of a 1976 amendment to the third exemption.[11] *Schecter v. Weinberger,* 165 U.S.App.D.C. 236, 506 F.2d 1275 (D.C.Cir. 1974); *Serchuck v. Weinberger,* 493 F.2d 663 (5th Cir. 1976). The Ninth Circuit did not, however, share this view, concluding as did Judge MacKinnon of the District of Columbia Circuit, that Section 1306 exempted information concerning both individuals and institutions. *People of the State of California v. Weinberger,* 505 F.2d 767 (9th Cir. 1974); *Schechter v. Weinberger,* 498 F.2d 1015 (D.C.Cir.1974); and although the legislative history does not unequivocally declare the scope of this provision,[12] contemporaneous enactments and subsequent interpretations by the agency charged with its administration both reveal that the nar-

---

**11.** In 1976 Congress amended 5 U.S.C. § 553(b)(3) to narrow the scope of this exemption by excluding statutes which permitted wholly discretionary nondisclosure. The Conference Committee Report on the final version of the Exemption 3 amendments stated:

> The conferees intend this language to overrule the decision of the Supreme Court in *Administrator, FAA v. Robertson,* 422 U.S. 255 [, 95 S.Ct. 2140, 45 L.Ed.2d 164] (1975), which dealt with section 1104 of the Federal Aviation Act of 1958 (49 U.S.C. 1504). Another example of a statute whose terms do not bring it within this exemption is section 1106 of the Social Security Act (42 U.S.C. 1306) [The statute involved in *Stretch v. Weinberger*].

H.R.Conf.Rep. No. 94–1441 *reprinted in* (1976) *U.S. Code Cong. & Admin. News,* 94th Cong., 2d Sess., 2244, 2261 (footnote omitted).

**12.** Section 1106 was introduced in the following manner:

> Two amendments of general character are contained in this bill. They are:
> 1. An amendment to prohibit the disclosure of information obtained by the Board or its

employees except under certain restricted conditions related to proper administration. House Report No. 728, 76th Cong., 1st Sess., at 32; Senate Report No. 734, 76th Cong., 1st Sess., at 39. The reports contained the following description:

> Section 1106: This section prohibits the disclosure, except pursuant to Board regulations, of any returns or statements filed with the Commissioner of Internal Revenue under title VIII of the Social Security Act or the Federal Insurance Contributions Act, or regulations thereunder, which have been transmitted by the Commissioner to the Board. The prohibition against disclosure, except pursuant to Board regulations, also extends to any file, record, report, paper, or information obtained by the Board or any of its officers or employees in the course of official duties, and any such material obtained by any person from the Board or any ot [sic] its officers or employees. Violation of the prohibition is punishable as a misdemeanor. House Report at 77, Senate Report at 88–89.

rower meaning ascribed by the Third Circuit was probably not intended.

42 U.S.C. § 1306 first appeared as an amendment to the 1935 Social Security Act. Act of August 10, 1939, Pub.L. No. 76–379, 53 Stat. 1398, 76th Cong., 1st Sess. As in any case involving issues of legislative intent, the starting point must be the language of the provision itself. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 557, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). To this extent, the phraseology of Section 1306 emphatically states that the prohibition against H.E.W. disclosure applies to "*any* file, record, report or other paper, or *any* information obtained at *any* time by the Secretary." It would be difficult to imagine a more comprehensive provision; and ironically, it was the very breadth of this language upon which the Secretary relied in refusing to reveal institutional records. As a result, in 1972 Congress found it necessary to amend Section 1306, thereby relaxing its general prohibition to permit prospective disclosure of certain institutional records. 86 Stat. 1329, 1428, 1461–1462. These amendments would not, of course, have been necessary if Section 1306 had not originally been intended to prohibit disclosure of "any" information submitted to the Secretary, including information concerning institutional participants in the medicare and medicaid programs. Furthermore, as noted by Judge MacKinnon and the Ninth Circuit, it is plainly incorrect to assume that Congress originally intended Section 1306 to apply only to information concerning individual recipients because the 1939 amendments specifically required each state to guarantee individual privacy in the programs which it administered, while generally prohibiting any and all disclosure by federal administrators. The fact that Congress treated these situations differently and employed unique terms in drafting each of the applicable provisions [13] can only underscore the fact that Section 1106 of the Social Security Act, 42 U.S.C. § 1306, was intended as a general prohibition of disclosure, regardless of the information's source.

Despite their disagreement concerning the breadth of the original section 1306 prohibition, the Courts have generally recognized the Secretary's broad authority to relax this absolute prohibition as the public interest may require. *People of the State of California v. Weinberger*, 505 F.2d at 768; *Schecter v. Weinberger*, 506 F.2d at 1277. Moreover, in view of the fact that this legislative provision has always been applied to agency records concerning institutional performance, there can be little doubt that the disclosure mandated by 20 C.F.R. § 422.435(c) is reasonably within the broad delegation of congressional authority conferred by Section 1306. In fact, if the Senate Committee report concerning the 1972 amendments were to offer any guidance, it would surely commend the administrative regulation now under attack.[14]

---

13. Compare 53 Stat. 1361, 1380, 1397. The House and Senate Reports explained these provisions as follows:

> The only other important amendment affecting the public assistance titles is one which requires the states, in order to receive federal grants, to provide safeguards to restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of the plan. All three assistance titles would be thus amended, the obvious purpose being to insure efficient administration and protect recipients from humiliation and exploitation.

House Report at 29, Senate Report at 31. These statements should also be compared with the *House and Senate comments* quoted at note 10, *supra*.

14. S.Rep. No. 92–1230, 92nd Cong., 2nd Sess., 1972 reveals recent Congressional judgments concerning H.E.W. disclosure:

> Disclosure of Information Concerning the Performance of Carriers, Intermediaries, State Agencies, and Providers Under Medicare and Medicaid
>
> (Sec. 249C of the bill)
>
> As part of his responsibility for administration of the medicare program, the Secretary, through the Social Security Administration regularly prepares formal evaluations of the performance of contractors—carriers, intermediaries and State agencies—which assist in program administration. In addition the Social Security Administration prepares program validation review reports, which are used as management and audit devices for informing intermediaries of findings and recommendations concerning selected providers

Consequently, there can be little doubt that the grant of authority set forth in Section 1306 contemplates the regulation at issue here. *See also, Cedars Nursing & Convalescent Center, Inc. v. Aetna Life and Casualty Insurance Co.,* 472 F.Supp. 296 (E.D.Pa. 1979); *Brookwood Medical Center, Inc. v. Califano,* 470 F.Supp. 1247 (N.D.Ga.1979).

### C.

■ Having determined that 20 C.F.R. § 422.435(c) constitutes a "substantive" regulation contemplated by an express congressional grant of quasi-legislative authority, it remains to be determined whether the Secretary promulgated this regulation in accordance with the procedural requirements imposed by Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553. This provision requires an agency to afford interested persons general notice of the proposed rulemaking and an opportunity to comment before a substantive rule is promulgated.[15] The notice of proposed rule-

of services and some of the aspects of their own medicare operations and of indicating necessary corrective follow-up action with respect to both the provider as well as the intermediary.

These evaluations and reports are of significant help in reviewing either the overall administrative performance of an individual contractor or a particular aspect of its operation. Additionally, the summary evaluations comparing the performance of one contractor with that of another are very useful. However, these evaluations and reports are not available to the public in general.

The committee recognizes the dilemma which exists in this situation. On the one hand is the need for public awareness of the deficiencies of contractors and provider performance with the accompanying pressures for improvement in administration that only such awareness can bring as well as the desire to conform with the overall intent of the Freedom of Information Act. On the other hand, these evaluations and reports require review of details some of which do not provide a basis for conclusion as to overall performance and the initial evaluation may not always be based on all the pertinent facts. The possible release of portions of a report which may include unqualified or incomplete information may be unfair to the contractors or providers. The committee recognizes that when there is public disclosure of this type of information on contractor performance there is a need to provide contractors with sufficient opportunity to respond to the information in the reports before their publication so as to avoid release of possibly erroneous findings, without rebuttal, which might prove damaging to their reputation.

The committee bill would require that the Secretary make public the following types of evaluations and reports dealing with the operation of the medicare and medicaid programs: (1) individual contractor performance reviews and other formal evaluations of the performance of carriers, intermediaries, and State agencies including the reports of followup reviews; (2) comparative evaluations of the performance of contractors—including comparisons of either overall performance or of any particular contractor operation; (3) program validation survey reports—with the names of individuals deleted.

The bill would require prompt and timely public disclosure of reports prepared by the Secretary and submitted to any contractor or provider of services for review and comment after the third month following enactment. Such reports would include only those which are official in nature and would not include internal working documents such as informal memoranda. Under the bill, public disclosure of evaluations and reports would not be required to be made until the contractor, State agency, or facility was given suitable opportunity—not to exceed 60 days—for comments as to the accuracy of the findings and conclusions of the evaluation or report with such comments being made part of the report where the portions originally objected to have not been modified in line with the comment. The reports would not be required to contain information concerning those deficiencies which are known by the Secretary to have been fully corrected within 60 days of the date they were initially brought to the attention of the contractor or provider of services.

It is the committee's intent that the requirement of disclosure of such evaluations and reports not lessen the effort of the Secretary in his present information-gathering activities nor is the provision in any way to be interpreted as otherwise limiting any disclosure of information otherwise required under the Freedom of Information Act.

Pp. 305–306. Moreover, the fact that the Finance Committee did adopt Senator Ribicoff's proposal to limit Section 1106 to individual records constitutes a Congressional reaffirmation that this section applied to institutional records, and that waiver of its terms, should, for the most part, continue to rest in the Secretary's discretion.

15. Informal rulemaking need not be based solely on the transcript of a hearing held before an agency. Indeed, the agency need not even hold

making published by the Secretary (40 F.Reg. 17849) and the promulgation statement (40 F.Reg. 27648) reveal that these procedural requirements were met. Plaintiff nonetheless urges this Court to impose additional procedural requirements after the fact because the minimum requirements fixed by Congress did not ensure mature consideration of the interests at stake. The United States Supreme Court has, however, repeatedly observed that Congress intentionally adopted minimal procedural requirements for public rulemaking.[16] While the agency is free to employ a more comprehensive formula, the Courts may not impose additional requirements absent "extraordinary" or "extremely compelling" circumstances. *Chrysler Corp. v. Brown*, 441 U.S. 281, at 312, 99 S.Ct. 1705 at 1723, 60 L.Ed.2d 208 (1979); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. at 543, 98 S.Ct. at 1211; *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333, 96 S.Ct. 579, 583, 46 L.Ed.2d 533 (1976); *Federal Communications Commission Schreiber*, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

Plaintiff argues that this case presents such circumstances because the notice of proposed rulemaking was misleading, issues of far reaching importance were to be considered, and because the Secretary ultimately failed to give these issues the type of "mature consideration" which they warranted. These general objections will not, however, justify departure from the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. at 544, 98 S.Ct. at 1212.

To begin with, the Secretary's notice of proposed rulemaking could not have been misleading to individuals who were familiar with the regulations and statutes under consideration. Since the institutions which are subject to such regulations are presumably familiar with their import, it can hardly be concluded that those affected did not receive adequate notice of the proposed rulemaking. With respect to plaintiff's argument that the importance of the issues warranted additional safeguards, reference need only be made to the United States Supreme Court's repeated warning that the complexity or importance of the issues under consideration will not alone justify ex

---

a formal hearing. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 547, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978).

**16.** The Senate Report explains Section 553 as follows:

This subsection states . . . the minimum requirements of public rule making procedure short of statutory hearing. Under it agencies might in addition confer with industry advisory committees, consult organizations, hold informal "hearings," and the like. Considerations of practicality, necessity, and public interest . . . will naturally govern the agency's determination of the extent to which public proceedings should go. Matters of great import, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures.

S.Rep. No. 752, 79th Cong., 1st Sess., 14–15 (1945). The House Report is in complete accord:

Uniformity has been found possible and desirable for all classes of both equity and law actions in the courts. . . . It would seem to require no argument to demonstrate that the administrative agencies, exercising but a fraction of the judicial power may likewise operate under uniform rules of practice and procedure and that they may be required to remain within the terms of the law as to the exercise of both quasi-legislative and quasi-judicial power. . . .

The bill is an outline of minimum essential rights and procedures. . . . It affords private parties a means of knowing what their rights are and how they may protect them. . . .

. . . [The bill contains] the essentials of the several forms of administrative proceedings. . . .

H.R.Rep. No. 1980, 79th Cong., 2d Sess. 9, 16–17 (1946).

post facto judicial interference with agency rulemaking procedures. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. at 545, 98 S.Ct. at 1212. Finally, as the next section of this opinion will reveal, the Court does not find the Secretary's action "arbitrary, capricious, [or] an abuse of discretion" and cannot therefore conclude that he failed to give these issues the type of mature consideration warranted by the interests at stake.

### D.

■ In *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court stated that any regulation mandating disclosure in violation of 18 U.S.C. § 1905 would be invalid because it was "not in accordance with law." *Id.* at 316, 99 S.Ct. at 1725. However, the Court also indicated that regulations which enjoyed the "force and effect of law" would operate to provide the "authoriz[ation]" which is necessary to invoke the internal exception to the general prohibition of the Trade Secrets Act. As noted earlier, a regulation can attain this status if (a) it is a "substantive" rule, (b) the reviewing court can reasonably conclude that the regulation was contemplated by a congressional grant of rulemaking authority, and (c) the applicable procedural requirements were satisfied during its promulgation. Inasmuch as 20 C.F.R. § 422.435(c) satisfies each of these criteria, it is entitled to the "force and effect of law." The authorization which it confers removes disclosure of medicare cost reports from the prohibition of 18 U.S.C. § 1905. The regulation is therefore "in accordance with law" and the Court must now consider whether the Secretary's action satisfies the remaining criteria of 5 U.S.C. § 706(2)(A).

### III.

Since the challenged regulation was adopted pursuant to Section 1106 of the Social Security Act, 42 U.S.C. § 1306, and this provision does not require an evidentiary hearing, H.E.W. was authorized to employ the "notice and comment" rulemaking procedure established by § 4 of the Administrative Procedure Act. 5 U.S.C. § 553. This Section of the APA contemplates a three-step rulemaking process which begins with the formulation and publication of an initial agency proposal. This proposal identifies the agency's tentative empirical findings and sets forth the conclusions of expert consultants upon which it may rely. The proposal may also contain a description of any empirical or methodological techniques which the agency has utilized in reaching its conclusions. The second step of the process is a solicitation period during which written or oral responses to the proposal may be submitted by interested parties.[17] The solicitation period is then followed by renewed agency deliberation, culminating in a statement announcing the rule and justifying or explaining its normative or empirical predicates through reference to the record which was developed in the first two steps. Wright, The Court and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L.Rev. 375, 395.

■ When Congressional rulemaking authority contemplates the notice and comment rulemaking procedure of § 553 without requiring a quasi-judicial hearing, reviewing courts need only determine whether the agency action, findings, and conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In applying this standard, the focal point will ordinarily be the administrative record already in existence, not some new record which is made initially by the reviewing court.[18] If

---

**17.** 5 U.S.C. § 553.

**18.** The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The Court can-

not supply an alternative, unstated ground to support an agency's decision if that ground is one that the agency alone is authorized to make. *Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973).

the decision of the agency is not sustainable on the administrative record which had been made, the rule must be vacated or the matter remanded for further consideration. *National Nutritional Foods Association v. Mathews*, 557 F.2d 325 (2d Cir. 1977); *Federal Power Commission v. Transcontinental Gas Pipeline Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976). De novo review is appropriate only where inadequate fact-finding procedures are employed in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions. *Camp v. Pitts*, 411 U.S. 138, 141, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).[19]

Inasmuch as the agency record is the focal point of notice and comment rulemaking review, and since a trial record is not ordinarily prepared, Section 553(c) requires the proponent to "incorporate in the rules adopted a concise [and] general statement of their basis and purpose." While this provision does not require the agency to supply the type of specific and detailed findings and conclusions which are customarily associated with quasi-judicial proceedings, *Consumers Union of United States, Inc. v. Consumer Product Safety Commission*, 491 F.2d 810, 812 (2d Cir. 1974), the language of Section 553 still mandates publication of a sufficiently detailed statement of the agency's rationale to permit meaningful judicial review. *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975).

There are as yet few specific rules defining the "adequacy" of an informal rulemaking record.[20] This is probably due to the fact that the requisites of meaningful review may vary depending upon the nature of the administrative action under consider-

ation. Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1291–1292 (1975). That is, pure policy determinations inherently defy articulation with any degree of mathematical precision, while technical judgments can generally be supported by concrete empirical findings and data. Nevertheless, even when an agency's judgment is one of policy, review must be based upon "the whole record or those parts of it cited by a party," 5 U.S.C. § 706(2), and the agency must articulate the basis for its policy choice with sufficient clarity to permit judicial review. *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. at 416–418, 91 S.Ct. at 823–824. As Judge Gurfein emphasized in *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir. 1977):

> It is not in keeping with the rational process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered. The agencies certainly have a good deal of discretion in expressing the basis of a rule, but the agencies do not have quite the prerogative of obscurantism reserved to legislatures. "Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body." *F. C. C. v. RCA Communications, Inc.*, 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953) (Frankfurter, J.).

To the extent that each agency bears the burden of offering some reasoned explanation for its notice and comment rulemaking, *United States v. Nova Scotia Food Products Corp.*, 568 F.2d at 251, 253; *Associated Industries of New York State, Inc. v. U. S. Department of Labor*, 487 F.2d 342, 352 (2d Cir. 1973), the Administrative Procedure Act requires that all new rules be accompanied by a "concise and general" statement of the findings and rationale

---

**19.** Neither situation is presented here. The only deficiency suggested during oral argument is that the Secretary inadequately explained his decision. As *Citizens To Preserve Overton Park v. Volpe, supra* demonstrates, this failure, even if it had occurred here, would not warrant de novo review. *See also Camp v. Pitts, supra.*

**20.** See, e. g. Hamilton, Procedures for the Adoption of Rules of General Applicability, 60 Cal.L.Rev. 1276, 1333–1336 (1972); Pedersen, Formal Records and Informal Rulemaking, 85 Yale L.J. 38, 45–51 (1975); Verkuil, Judicial Review of Informal Rulemaking, 60 Va.L.Rev. 185 (1974), but see 42 U.S.C. § 7607(d).

which underlie them. Second Circuit case-law indicates that the adequacy of such statements should be assessed in light of the following general principles:

"What we are entitled to at all events is a careful identification by the Secretary, when his proposed standards are challenged, of the reasons why he chooses to follow one course rather than another. Whether that choice purports to be based on the existence of certain determinable facts, the Secretary must, in form as well as in substance, find those facts from evidence in the record. By the same token, when the Secretary is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, he should so state and go on to identify the considerations he found to be persuasive."

*United States v. Nova Scotia Food Products, Inc.*, 568 F.2d at 253. Then, if the reviewing court determines that an administrative agency's stated justification for its informal rulemaking does not provide an adequate basis for judicial review, it must conduct an *Overton* hearing to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.[21]

The application of these principles is well illustrated by the National Nutritional Foods litigation. *National Nutritional Foods Association v. Weinberger*, D.C., 376 F.Supp. 142, *remanded* 512 F.2d 688 (2d Cir.) *cert. denied sub nom., National Nutritional Foods Association v. Mathews*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); *National Nutritional Foods Association v. Mathews*, D.C., 418 F.Supp. 394, *rev'd* 557 F.2d 325 (2d Cir. 1977). There, producers and vendors of vitamin preparations challenged an FDA "notice and comment" rule which classified vitamins A and D as "drugs" when dispensed in excess of certain designated dosages, thereby restricting such dosages to prescription sales. On a motion for summary judgment, the district court upheld the regulations and dismissed the complaint, finding that 21 C.F.R. § 3.94–5 satisfied the arbitrary and capricious standard of review. *National Nutritional Association v. Weinberger*, 376 F.Supp. 142 (S.D. N.Y.1974). The Court of Appeals did not, however, agree. It noted that these regulations had been adopted to interpret the definition of "drugs" provided by Congress in 21 U.S.C. § 321(g)(1). This statute requires a finding of therapeutic purpose and intent before a product may be classified as a "drug". *National Nutritional Foods Association v. Food & Drug Administration*, 504 F.2d 761, 789 (2d Cir.) *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). The Commissioner made no such finding. Moreover, in an intervening pro-

---

**21.** *In Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Secretary of Transportation rendered a decision following a statutorily required public hearing designed to afford community input concerning the use of park land in highway construction. The hearing was non-evidentiary and quasi-legislative in nature. It required no formal findings of fact.

On review in the district court, the parties introduced opposing affidavits addressing the validity of the decision. On appellate review, the Supreme Court held that de novo consideration was unauthorized and that the affidavits were merely "post hoc rationalizations" which had traditionally been regarded as an adequate basis for review. Review, said the Court, is to be based "on the full administrative record that was before the Secretary at the time that he made his decision." *Id.* at 420, 91 S.Ct. at 825.

Two years later, the Court reinforced the doctrine that judicial review of informal agency adjudication is to be conducted solely upon the administrative record. In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Comptroller of Currency, proceeding under a statute which did not require a formal hearing, refused to issue a certificate authorizing the organization of a new bank. That refusal came under attack in a district court which, on examination of the record which was before the Commissioner, held that de novo review was unwarranted; and, viewing only the administrative record, sustained the Comptroller's ruling. Although the Circuit Court would have remanded the case for a trial de novo, the Supreme Court agreed that the appropriate standard of review was whether the Comptroller's adjudication was arbitrary, capricious, or an abuse of discretion, and that in applying this standard the focal point for review should be the existing administrative record, not a new record made initially by the reviewing court. *Id.* at 142, 93 S.Ct. at 1244.

ceeding, the Court had invalidated another FDA regulation which would have classified as "drugs" certain preparations in excess of the U.S. Recommended Daily Allowance. 21 C.F.R. § 80.1(f)(1). The invalidation of 21 C.F.R. § 125.1(h) did not, however, automatically result in repudiation of the regulations under review because the Court noted that, while not apparent from his promulgation statement, the Commissioner may have engaged in a more detailed analysis of vitamins A and D than he did with the generic rule which was overturned in *National Nutritional Foods Association v. FDA, supra.* Accordingly, the matter was remanded to the district court for an "Overton-type" hearing where Judge Frankel was directed to give the Commissioner an opportunity to present his complete reasoning with respect to the vitamin A and D drug classifications, either through affidavits or testimony.

■ In light of this precedent, the following analysis suggests itself. First, the applicable standard for review must be particularized. Second, the Court must determine whether the agency record presented thus far is adequate to permit meaningful judicial review. If it is not, the Court must conduct an "Overton-type" hearing to permit the Secretary to present his complete reasoning. On the other hand, if the administrative record is adequate to permit meaningful judicial review, the Court may immediately proceed to consider whether the Secretary's action was "arbitrary, capricious, [or] an abuse of discretion."

■ In determining whether an agency's action has been arbitrary, capricious, or an abuse of discretion, the Court must ascertain whether the decision was based upon the consideration of relevant factors. *See Citizens To Preserve Overton Park v. Volpe, supra; Sabin v. Butz,* 515 F.2d 1061, 1067 (10th Cir. 1975); *AFSCME v. City of Cleveland,* 484 F.2d 339, 346 (6th Cir. 1973). Applied to regulations mandating agency disclosure, this general principle has been refined to require agency consideration of:

(1) whether disclosure of the particular information will aid the agency in fulfilling its functions,

(2) the harm, if any, to providers and the public if the information is disclosed

(3) alternatives to full disclosure which will provide consumers with adequate knowledge to make informed choices and participate in the regulatory process.

*Pennzoil v. Federal Power Commission,* 534 F.2d 627, 632 (5th Cir. 1976); *Superior Oil Co. v. Federal Energy Regulatory Commission,* 563 F.2d 191, 203 (5th Cir. 1977); and, in the final analysis, the agency must, of course, determine whether the public interest in disclosure outweighs the potential harm to the provider. *Pennzoil v. Federal Power Commission,* 534 F.2d 631–632.[22]

■ The Secretary and the Department of Health, Education and Welfare are charged with administering numerous social welfare programs and assuring the proper expenditure of public funds. The statements in both the Memorandum of Record and the promulgation statement reveal the Secretary's determination that disclosure of hospital cost reports would aid the department in meeting its obligations to the nation by exposing direct evidence of medicare abuse to public scrutiny.[23] Furthermore, the Secretary's Memorandum of Record and promulgation statement reveal that

---

**22.** The *Pennzoil* case is, however, distinguishable in one important respect—the agency had merely indicated that disclosure might cause harm and summarily concluded that the public interest outweighed this danger. The Circuit Court held that this brief statement was inadequate to justify such a conclusion. Here, by contrast, the agency prepared a four page "Memorandum of Record" and published a two page explanation of its action in the Federal Register.

**23.** In addition, the disclosure of cost reports will provide the public with the information which is necessary to determine a hospital's financial stability as well as its commitment to providing quality services in a particular treatment area. It will therefore facilitate informed decision making in the selection of hospitals and nursing homes. *St. Mary's Hospital, Inc. v. Califano,* 462 F.Supp. 315, 319 (S.D.Fla. 1978).

this conclusion was not drawn until the competitive need for privacy, the existence of confidentiality, and the harm which might result from routine disclosure of cost reports had all been considered. In particular, the Secretary found that competition among providers is not even remotely as intense as competition between sellers in other areas of the economy. Then, responding to comments suggesting that disclosure of cost reports would lead to confusion and encourage abuse by labor organizations, the Commissioner stated:

> The Social Security Administration knows of no evidence and does not accept the assertion that labor unions and consumer groups are seeking to destroy the hospitals of the United States.

40 F.Reg. 27649.

Turning to the third criterion there can be little doubt that the Commissioner carefully reviewed various alternatives to full disclosure prior to adopting § 422.435(c). Indeed, the memorandum of record reveals that prior to 1970, cost reports information had been kept confidential by the Secretary and his fiscal intermediaries. In 1970, cost report information was opened to public scrutiny, but only to the extent of revealing information "relating to payments to, and utilization data concerning, providers and other organizations and facilities furnishing services under Title XVIII of the Act." The Commissioner determined that although this limited amount of disclosure was useful, it was not sufficient.

As might be anticipated, the commentators did not wholeheartedly agree with the Commissioner's recommendation, and at least one of them suggested an alternative—allowing providers to prepare a cost report abstract for public disclosure. This proposal was, however, rejected because it would enable a provider to conceal whatever information it chose. The Commissioner also found this proposal "contradictory to the basic purpose underlying the provision." 40 F.Reg. 27649.

The preceding analysis reveals that the agency's rationale in adopting 20 C.F.R. § 422.435 has been stated with sufficient clarity to permit meaningful judicial review. An "Overton-type" hearing is therefore unnecessary, and no triable issues of fact have been presented with respect to the APA claim. It is also clear that § 422.435 was promulgated only after the Commissioner had determined that full disclosure would assist the agency and advance the public interest without imposing significant commercial hardships upon providers. Furthermore, there can be little doubt that the Commissioner did not opt for full disclosure until other more restrictive alternatives which had been tested or proposed were found inadequate to the task. Accordingly, the Court cannot conclude that the promulgation of this provision was either arbitrary, capricious, or an abuse of discretion. Nor is the regulation not "otherwise in accordance with law."

The Government's motion shall therefore be granted, plaintiff's application for preliminary injunctive relief is hereby denied, and the Clerk is hereby directed to enter a judgment dismissing the plaintiff's complaint.